## Commonwealth v. Ronello, Appellant.

*Criminal law—Murder—Trials—Charge to jury—Identification of defendant—Identification of weapon—Inadequacy—Degree—Expression of opinion by trial judge.*

1. Where on the trial of an indictment for murder, the charge to the jury made the fate of defendant depend on whether he was the person whom the witness for the Commonwealth saw by the light of a passing engine on a public road near the scene of the

crime, on the night of its occurrence, and the identification of the prisoner as the person seen by the witness, rested wholly on her opinion, (the value of which depended upon the facts which she gave to warrant the inference which she drew), that the two men were one and the same, instructions that in order to convict the defendant, the jury must find that the witness had "properly identified" the defendant with the man whom she had seen, without even a hint as to what the jury should regard as a proper identification, were so inadequate as to constitute reversible error.

2. In such case, the charge was unfair to the defendant and misleading where the testimony of the witness in chief was read to the jury, and referred to as though it were all of her testimony, while her testimony on cross-examination, in which she stated that she did not see defendant's features or face, was not referred to.

3. In such case, where the Commonwealth sought to establish that a knife found in the bed of a river, near the scene of the crime, two months after the murder was committed, was the same knife that had been seen in the possession of the accused on the day of the murder, the absence of all instructions from the court as to what was identification, upon what it rests, and the degree of certainty the evidence must reach to warrant a conclusion of identity, was reversible error.

4. Where in such case, the jury were fully instructed as to the distinction between murder of the first and murder of the second degree, and were further instructed that if they found the defendant guilty, it would be for them to determine the degree of guilt, it was not error for the trial judge to express the opinion that if the defendant were guilty at all, he was guilty of murder of the first degree under the evidence in the case.

5. In such case, where evidence of the defendant's previous good character was offered, it was reversible error to charge the jury, that if the jury was satisfied beyond a reasonable doubt under all the evidence that the defendant was guilty, evidence of previous good character was not to overcome the conclusion which followed from that view of the case.

*Trials—Improper remarks of prosecuting attorney—Jurors— Separation—Motion for continuance—Refusal—Act of June 19, 1913, P. L. 528.*

6. On the trial of a homicide case it was error to refuse a continuance, where the district attorney in his address to the jury stated "I say to you again, if I did not think he (the defendant) was guilty, I would not ask you to find him guilty because my oath does not require anything of that kind. My honest conviction is that he did that dastardly deed."

7. In such case, it was an abuse of discretion to refuse a continuance, where it appeared that the jurors, after having been empaneled and sworn, had been allowed to separate; and the fact that the evidence did not show that anything improper was said or done to influence any juror, or that any one of the jurors spoke to anyone about the case, or that anyone spoke to any of them was immaterial.

8. The imposition of the sentence of death by electrocution as provided by the Act of June 19, 1913, P. L. 528, is error, where the crime was committed prior to the passage of the act.

Argued Oct. 4, 1915.    Appeal, No. 239, Jan. T., 1915, by defendant, from judgment of O. and T., Huntingdon Co., Sept. Sess., 1912, No. 9, on verdict of guilty of murder of the first degree, in case of Commonwealth v. Frank Ronello.    Before BROWN, C. J., POTTER, STEWART, MOSCHZISKER and FRAZER, JJ.    Reversed.

Indictment for murder.    Before WOODS, P. J.

The facts appear in Commonwealth v. Ronello, 242 Pa. 381, and in the opinion of the Supreme Court.

Verdict of guilty of murder of the first degree upon which sentence of death was passed.    Defendant appealed.

*Errors assigned* were the charge to the jury, instructions to the jury, the refusal of the court to grant a continuance and the sentence of the court.

*Wm. Wallace Chisolm,* with him *Samuel I. Spyker,* for appellant.

*Charles C. Brewster,* District Attorney, and *Richard W. Williamson,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE STEWART, January 3, 1916:
The appellant has for a second time been convicted of the murder of one Guisseppe Visalli.    His appeal from the judgment following the first conviction, reported in

242 Pa. 381, was sustained, and the judgment was reversed for errors appearing in the record. The second trial resulted, as the first, in a verdict of guilty of murder of the first degree, and appellant is again under sentence of death. From the judgment and sentence following the second trial we have the present appeal. The evidence was substantially the same in both trials. Some of the errors appearing in the former were avoided in this; others, it is complained, were repeated in modified form, while several not appearing in the first are here made the subject of fresh complaint. The facts of the case are so fully recited in the opinion reversing the former judgment above referred to, that it will be only necessary to refer to them here in a general way, in view of the nature of the assignments which we propose to consider.

That Guisseppe Visalli was slain by the hand of a murderer was too evident to be disputed. Though no human eye witnessed the tragedy the wounds found upon his dead body, by their number and character, furnished irrefragable proof that he fell the victim of a felonious assault. Was it the hand of the appellant that inflicted these wounds? This was the only question in the case. The evidence pointing to his guilt was wholly circumstantial. On the morning of July 22, 1912, the dead body was found covered with wounds, any one of a half a dozen of which would have been sufficient to cause death, while either of three of them would have been sufficient to cause death almost instantly. It was found in a secluded spot at a point nearly midway between the Borough of Huntingdon and the Village of Ardenheim, at the foot of a steep embankment along the Juniata river, about 65 feet from the line of the Pennsylvania Railroad, and about 30 feet from the public road on the same side of the river leading from Huntingdon to Ardenheim. Expert testimony was to the effect that death had occurred from 24 to 36 hours before discovery. The victim was last seen alive on Saturday night preceding

the discovery.  He had been in Huntingdon in the afternoon and evening of that day, and he and the defendant had been there seen at the same hotel, but not in company with each other.  Visalli took the train about 10 o'clock that evening in company with his nephew to return to Ardenheim, the station nearest the place he made his home.  Having reached the station the two there separated, each going his own way.  That was the last seen of Visalli alive.  The theory of the Commonwealth was that he met his death on his way from the station to his home between the hours. of 10 and 11 o'clock, at the place where his body was found.  As upon the first trial, so upon the second, the evidence relied upon by the Commonwealth to connect the defendant with the murder was, first, the testimony of a young woman who with a younger brother when driving along the road leading from Huntingdon to Ardenheim, between the hours of 10 and 11 on the Saturday night preceding the discovery of the body, having reached a point not far from where the dead body was found, saw by the light from an open fire box of a passing engine at the distance of 30 feet or more from where she was, a man walking rapidly on the side of the public road next the river in the direction of Huntingdon, the Commonwealth's contention being that this person was the defendant; and second, the testimony with respect to a knife found two months after the occurrence at a point some 25 feet out in the river from the place where the body lay, and which the Commonwealth claimed was identified as a knife that had belonged to the defendant and had been seen in his possession on the afternoon of the day the murder was committed.  Beyond these circumstances there was nothing shown to connect this defendant with the crime.  The chief, we do not say only, significance of the evidence first above referred to lies in the fact that the defendant testified that he was not outside the Borough of Huntingdon during the evening or night of the fatal occurrence. Except as the evidence established the identity of the

defendant with that of the person seen by the witness on the public road at the time and place indicated in her testimony, the chain of evidence connecting defendant with the crime would be incomplete. The identification was a fact essential to the Commonwealth's case, and the evidence relied upon to establish it called for closest scrutiny and most careful instruction. In our review of the case as presented on the former appeal, when the charge of the court with respect to the testimony on this branch of the case was being considered, we found occasion to say, (p. 387), "Failure on the part of the court to specially direct the attention of the jury to this most material evidence, seeing that upon it depended the issue of the case, would have been serious error: to leave the jury without instruction as to how it was to be considered, the degree of certainty it must reach to warrant a conclusion of identity was, if possible, even more serious error. Identification is necessarily a matter of inference, and the probative weight to be accorded the testimony of witnesses who speak as to this point, is exclusively for the jury, to be judged by them, in the light of the evidence in the case, and especially in the light of the facts upon which the inference is based." We held that the charge there was an inadequate presentation of the law and the evidence and accordingly reversed the judgment. A comparison between the charge in that case and the charge in this will show entire failure to avoid in the latter the error which in the former compelled a reversal of the judgment. Without repeating here the instructions of the court in the earlier case with respect to this testimony, it will be sufficient to recite what was said in relation to it in the charge in the later case. After stating in a very general way the incident as related by the witness, her visit to the jail where the defendant was confined the week after the occurrence, and that she had testified to her belief that the defendant whom she there saw and the person whom she met on the road were one and the same, the only in-

struction that followed was, "You will remember the
testimony, gentlemen of the jury.    It is for you to say
whether this girl properly identified this defendant.    If
you have any reasonable doubt about it, the doubt is for
the benefit of the defendant to work his acquittal, but as
we have already stated, that doubt must arise from the
evidence."    Without further comment the trial judge
then proceeded to read to the jury the whole of the testi-
mony in chief of the witness, concluding with the state-
ment, "Now, gentlemen of the jury, that is the testimony
of Miss Foust."    That the trial judge fully realized the
importance of this witness' testimony is manifest from
his instruction that a reasonable doubt whether it prop-
erly identified the defendant would be sufficient to work
his acquittal, and yet, in a charge covering more than a
dozen pages the extract we have given above covering
but five lines contains the only instruction given with
respect to it.    When it is considered that by the charge
to the jury the fate of the defendant was made to depend
on whether he was the person whom the witness saw on
the public road near the scene of the tragedy on the
night of the occurrence, that the identification rested
wholly on the opinion of the witness, the value of which
opinion depended upon the facts she gave to warrant the
inference on her part that the two men were one and the
same, that all that the instruction required to sustain a
conviction was that the jury should find that the witness
had "properly identified" the defendant, without even a
hint as to what the jury should regard as a proper identi-
fication, the meagerness of the charge amounting to
inadequacy becomes apparent.    Not only was it insuffi-
cient, but it was conspicuously unfair to the defendant,
and in effect misleading in that the testimony of the
witness in chief was read to the jury and referred to as
though it were all of her testimony, while the testimony
of the witness on cross-examination, notwithstanding it
was every whit as much for the consideration of the jury
as the testimony in chief, and supplied in a larger degree

the facts and circumstances from which the jury were
to determine the weight to be given the witness' asser-
tion of identity, was not once referred to.  It appears
in the cross-examination that the night the witness met
the man on the road whom she thinks was the defendant,
was quite a dark night, that she would have had no op-
portunity of identifying the man but for the fact that an
open fire box from an engine that had passed three or
four car lengths or more threw a gleam of light in the di-
rection she was traveling; that by this light she saw a
man close against the bushes as he came opposite the
horse she was driving and then opposite her buggy, on
the river side of the road; that at this time she was driv-
ing her horse at a trot.  Having thus described her
meeting the man she was asked "What sort of a hat did
the man have on?"   She answered "I don't believe I no-
ticed it."   Then followed these questions and answers,
"Describe his features."  A. "I can't describe his fea-
tures."  Q. "Did you see his face at all?"  A. "I saw that
he was dark and tanned, he was tanned."  Q. "And what
else?"  A. "He was slouched forward as he walked."
Q. "I am asking you what his features were.  Describe
his features for us."  A. "I cannot describe his fea-
tures."  Q. "Isn't it a fact that you didn't observe his
features at all?"  A. "Not his features."  Q. "You
didn't observe them?"  A. "He had his head bent for-
ward."  Q. "And yet—notwithstanding the fact that
you did not observe with sufficient care to recognize what
sort of a hat he had on, or recognize his features, you
went up to the jail some time after that and picked out
a man whom you believed was the man you saw on the
river bank that night?  Is that so?"  A. "Yes, I said
the man whom I saw in the jail I believed to be the same
man."   We intimate no opinion of our own as to the
weight that should be allowed this testimony; that is a
matter resting exclusively with the jury; all that we
say is, that the facts and circumstances it develops, espe-
cially in view of the fact that in her testimony in chief

the witness testified to no distinguishing mark of identification, called for most careful consideration by the jury in their inquiry as to the sufficiency of the alleged identification, under helpful instruction from the court as to how the evidence was to be applied. For the court to utterly ignore it after having read to the jury the witness' testimony in chief and referred to it as the testimony of the witness, as though it were the whole or the only part the jury was to consider, was most unfair to the defendant.

What we have said applies as well to the instruction given the jury with respect to the knife found some two months after the murder in the bed of the river. What the Commonwealth sought to establish was that this was the same knife that had been seen in the possession of the accused the afternoon of the day of the murder. We are not to be understood as questioning the sufficiency of the identification; that again was a question for the jury; but in the absence of all instruction from the court as to what is identification, upon what it rests, and the degree of certainty the evidence must reach to warrant a conclusion of identity, it must follow that if here a proper conclusion was reached it was accidental, and not because the processes of investigation which the law contemplates and which it is the duty of the judge to expound, were observed.

We feel compelled for the reasons stated to sustain the assignments of error which complain of the court's charge in the matter we have discussed.

Since the result must be another trial of the defendant, an expression of view with respect to several remaining assignments of error becomes necessary. The assignments number forty-eight in all and the consideration of them here separately would be altogether impracticable. Several of them point to unmistakable error which would call for a reversal of the judgment did the record disclose no more. To these we shall briefly refer. We pass by such as complain that the charge

denied to the jury the right to find the defendant guilty of second degree murder, with the single observation, that while it is apparent from the language of the charge that in the opinion of the trial judge, if the defendant were guilty at all, he was guilty of murder of the first degree under the evidence in the case—an opinion which we do not hesitate to say was fully warranted by the evidence—its expression in no wise constrained or restricted the action of the jury.   The jury had been fully instructed as to the distinction between the murder in the first and murder in the second degree, and had been further instructed that if they found the defendant guilty, it would be for them to determine the grade of guilt: Kilpatrick v. Com., 31 Pa. 198.

The defense had offered testimony of the defendant's good reputation.   The instruction with reference to it was as follows: "A large number of witnesses have been called who testified to the good character of the defendant prior to the time of the commission of this act.   Evidence of good character is substantive and positive proof in the prisoner's behalf by making it improbable that a man of such character would commit the offense charged. Where the jury is satisfied beyond a reasonable doubt under all the evidence that the defendant is guilty, evidence of previous good character is not to overcome the conclusion which follows from that view of the case." Under our authorities this was reversible error.   It is only necessary to refer to the rather recent case of Com. v. Cate, 220 Pa. 138, where the language of the charge was identical with that used here.   The trial judge strangely enough in adopting the language employed by the trial judge in that case, overlooked the fact of its condemnation as error by this court, and the reversal of the judgment in consequence.

The prosecuting officer of the Commonwealth in his closing address to the jury, not only once but repeatedly, in most vigorous language asserted his personal belief that the defendant was guilty of the murder of Visalli.

His remarks were called to the attention of the court and were made matter of record. A motion to withdraw a juror was made which was refused, with a caution to the jury that they should not allow themselves to be influenced by the objectionable remarks. To show that such caution was wholly inadequate to the protection of the defendant's rights it is quite enough to cite a single illustration. In the course of his address the officer thus expressed himself, "I say to you again, if I did not think he (the defendant) was guilty, I would not ask you to find him guilty, because my oath does not require anything of that kind.—My own honest conviction is that he did that dastardly deed." This remark was wholly inexcusable, and so violative of the prisoner's right to a fair trial on the evidence submitted and that alone, that a mere caution to disregard could give no assurance that the prejudice otherwise certain to result to the defendant had been averted. It was an abuse of discretion on the part of the court to refuse the motion for the withdrawal of a juror and the continuance of the case.

The evidence in support of a motion for a new trial disclosed the fact that the jurors after having been empaneled and sworn had been allowed to separate. Repeated instances of such separation were shown to have occurred during the trial. This, using the language of the court in Com. v. Gearhardt, 205 Pa. 387, was in palpable violation of the unbroken practice of the Courts of Oyer and Terminer, especially in capital cases and meets without condemnation. "The mere fact of separation further than is necessarily required to enable the jurors to perform their duty as such, and under the care of a sworn officer, creates a presumption of improper influence which the Commonwealth must rebut or remove by clear and satisfactory evidence." Peiffer v. Com., 15 Pa. 468. The motion to withdraw a juror was refused on the ground that "the evidence did not show that anything improper was said or done to influence any juror,

nor does the testimony reveal that any one of the jurors spoke to any one about the same, or that any one spoke to them." This was not the test to apply. It was an abuse of the court's discretion to proceed with the trial under the circumstances.

The sentence of the court was under the Act of June 19, 1913, P. L. 528, which changes the method of inflicting the death penalty from hanging to electrocution. The trial judge in so sentencing the prisoner overlooked the fact that it is provided in the eleventh section of this act that its provisions shall not apply to any case in which it shall appear that the crime was committed prior to the date of the approval of the act.

We have thus referred to these manifest errors appearing in the record, not that they are likely to be repeated on the next trial, but to put beyond possibility their recurrence on the third trial of this defendant.

The judgment is reversed and a venire de novo is awarded.