Commonwealth *v.* Minoff, Appellant.

288

Argued September 26, 1949. Before MAXEY, C. J., DREW, LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Maurice R. Metzger,* with him *Walter H. Compton* and *Metzger & Wickersham,* for appellant.

*Carl B. Shelley,* District Attorney, with him *Huette F. Dowling,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE JONES, November 14, 1949:

The defendant was convicted of murder in the first degree with penalty of death on each of two separate indictments charging him with murder for the killing of Koche Atzeff and Boris Mioff. He filed motions for a new trial and also, belatedly, motions in arrest of judgment. The learned court below denied all motions and entered judgments of sentence on the verdicts. The defendant took these appeals and has filed twenty-one assignments of error. These assignments are covered by eight questions of law which the appellant has stated for argument and which we shall consider seriatim.

The first question, thus raised, is whether the Commonwealth offered sufficient competent evidence to warrant verdicts of murder in the first degree. The defendant admits having fired the fatal bullets but contends that he did so in self defense; or, if not in self defense, that he acted under heat of sudden passion and without malice, wherefore the crimes could not be more than voluntary manslaughter; or, even if the homicides were murder, that they were not willful, deliberate and premeditated killings, wherefore the crimes did not rise higher than murder in the second degree.

While the testimony adduced by the defendant conflicts in certain particulars with that offered by the Commonwealth, such conflicts did no more than raise issues of fact which were for the jury to determine. From the evidence, the jury could have found and, in the light of the verdicts, presumably did find the material facts to be as follows.

The defendant, George Minoff, age 51, and the two victims, Koche Atzeff, age 24, and Boris Mioff, age 32, were members of the Macedonian-Bulgarian Orthodox Church of Steelton, Pennsylvania. For some twenty years, the congregation had been rent by schism into two jarring sects. The defendant belonged to the one

group and the victims to the other. The bad feeling between the two divisions over the doctrinal teaching or tenet that separated them was very intense. As a consequence of the internal dissension, the church had been without a priest since 1944 and was served only by a visiting priest from time to time. The selection of a full-time priest, with which the members of the church were concerned in late 1947 and early 1948 served to promote further differences and bitterness. A congregational meeting was called for Sunday afternoon, April 4, 1948, to consider matters concerning the call of a priest from Sofia, Bulgaria, whose departure for this country had apparently been delayed through a misunderstanding allegedly engendered by some of the members of the church. The meeting which was held in the church hall, located in a separate building near the church, was largely attended. The members of the one group sat on chairs along one side of the hall while the members of the other group, also sitting on chairs, were along the other side of the hall. The proposed reading of a letter from the priest in Sofia and, especially, whether a certain portion or the whole of that letter should be read provoked heated discussion. While the argument was going on, one George Patoff, a member of the defendant's group, was on his feet objecting to the course being followed in presenting the letter. Lazo Atzeff, father of Koche, one of the victims, went over from the side of the hall where his group were seated to where Patoff was standing and asked him to be quiet. Patoff told him to "get out." Koche and his brother, Boris Atzeff, moved across the hall and stood by their father. One Nikolo Taleff, a friend of the defendant and a member of his group, raised a chair and attempted to strike Boris Atzeff. Boris struck Taleff, knocking him to the floor. Up until then, the defendant, who was sitting along the wall on the side of the hall occupied

by his group, had made no move. He was some twenty to thirty feet from where the altercation was going on. He arose and began pushing toward Patoff and the Atzeffs. Making passes with his arms, he moved closer to the gathering. Once there, he pulled a thirty-eight caliber revolver from under his coat which he fired without warning and shot Koche Atzeff who died almost instantly. When Koche had fallen to the floor, Boris Mioff bent over him apparently to render assistance; and, while Boris was in that position, the defendant fired a second shot, fatally wounding Boris who died four days later. It was not until after the second shot had been fired by the defendant that anyone laid hands upon him. He had carried the revolver underneath his coat and sweater on his left side between his trousers and his shirt and, from there, withdrew it to fire the fatal shots. The defendant had a permit to carry a revolver, which he testified he always did in going to and from his work in his brother's restaurant, the brother having been attacked and robbed some time before. The defendant had been in the restaurant a short while before going to the congregational meeting and had intended to return there later that afternoon to work for about four hours. He took the revolver with him to the meeting, however, although he did leave in the restaurant his Sunday papers which he had just purchased at a drug store.

The evidence in the case, supporting the verdicts, contains the ingredients of murder in the first degree. The homicides were felonious. The defendant was an aggressor and could not claim he acted in self defense: see *Commonwealth v. Zec*, 262 Pa. 251, 257, 105 A. 279. On his own testimony, when he rose from his seat, the altercation between Patoff and Lazo Atzeff was going on some fourteen to sixteen feet in front of him; yet, he voluntarily went forward hostilely to the scene of

the quarrel. The situation in which he thereafter found himself was of his own choice and making; and he is criminally responsible for the consequences of his conduct. See Wharton's Criminal Law (Twelfth Ed.), Vol. 1, § 614, p. 828. Moreover, the testimony, which the jury presumably accepted, is that the defendant had not been touched by anyone before he fired the fatal shots. The killings, being felonious, were inherently malicious and, without more, the consequent crimes qualified as murder as a matter of law: see *Commonwealth v. Wucherer*, 351 Pa. 305, 310-313, 41 A. 2d 574; and *Commonwealth v. Samuel Jones*, 355 Pa. 522, 525, 50 A. 2d 317. Furthermore, the hardness of heart displayed by the defendant in shooting down young Atzeff in the way he did and the shooting of Boris Mioff when the latter was exercising a humane impulse justified the jury in finding express malice on the part of the defendant. On either basis, the killings were murder: *Commonwealth v. McLaughlin*, 293 Pa. 218, 221, 142 A. 213. And, a specific intent to take life was inferable from the defendant's deliberate use of his deadly weapon for a manifest purpose upon vital parts of the bodies of the deceased: see *Commonwealth v. Samuel Jones*, supra, at p. 526 and cases there cited. The murders were willful, deliberate and premeditated killings and, being such, were murder in the first degree: Act of June 24, 1939, P. L. 872, Sec. 701, 18 PS § 4701.

The appellant next complains that the trial judge erred in not withdrawing a juror on the defendant's motion because a talesman, when testifying on his *voir dire* as a prospective alternate juror, had stated in the presence of the twelve jurors, already sworn, that he had formed an opinion as to the defendant's guilt and "figured he was guilty." The quoted remark was abruptly volunteered as a part of the juror's answer to a question by counsel for the defendant as to whether he had ". . .

formed and expressed any opinion as to the guilt or innocence of this defendant." The juror answered,— "Yes; I figured he was guilty—." The answer was broken off by the learned trial judge's immediate interjection, ——"No, no. We instruct the jury to disregard that statement entirely." Counsel for the defendant insisted that irreparable damage had been done and the court then said "Go ahead and make whatever motion you want." Whereupon counsel moved for the withdrawal of a juror, which motion the court denied but again instructed the jury as follows: "The juror inadvertently made a statement as to his opinion gained from reading the newspapers. I instructed at that time, and now instruct you again, to completely disregard the statement which the juror made. The responsibility of the decision in the case will be your responsibility, to be based upon the evidence and the evidence alone." The juror was challenged by the defendant for cause and the challenge was sustained. Certain it is that what the learned trial judge did in this connection was the utmost that could have been done in the circumstances to eradicate any possible harm from the inadvertent remark; and it was all that needed to be done: see *Commonwealth v. Dreamer*, 324 Pa. 220, 222-223, 188 A. 117. The sufficiency of a like caution in a similar situation in the *Dreamer* case did not depend upon the fact that defendant's counsel had requested it. The case of *Commonwealth v. Ronello*, 251 Pa. 329, 339, 96 A. 826, cited by the appellant is distinguishable. It is a far different thing for a district attorney in the course of a trial to proffer to the jury his personal opinion as to a defendant's guilt.

There is not the slightest merit in the appellant's third contention that the trial court erred in refusing to allow the defendant to show in cross-examination of a Commonwealth's witness more of the background

of the church dispute. The extent of cross-examination at any time rests in the sound discretion of the trial judge. But, the important thing here is that the defendant was given plenty of leeway in cross-examining witnesses for the Commonwealth and was not precluded at any time from offering in his own case anything relevant and material. Indeed, the church dispute was gone into by both sides in far more detail than was necessary to a just determination of the issues.

A further contention of the appellant is that the trial court failed to instruct the jury adequately with respect to the effect and purpose of testimony elicited by the district attorney in cross-examining a witness for the Commonwealth after a plea of surprise. When the district attorney asked leave to cross-examine the witness because of his contradictory testimony, the learned trial judge stated in the hearing of the jury,— "Your right to cross-examine is only to destroy the effect of the testimony given, not for the purpose of establishing any facts." And, again, in the charge to the jury, the trial judge, after referring to the testimony of this witness given on direct examination and the fact that the Commonwealth had cross-examined him as to contradictory statements, submitted the matter to the jury in the following manner: "Whether that discredits his testimony is a matter for you to determine." Counsel for defendant made no request for any further instructions in such regard. Nor did the defendant suffer any harm thereby. The brief for the appellant incorrectly states that the facts brought out by the district attorney in his discrediting cross-examination of the witness for the Commonwealth ". . . is the only testimony in the record which supports the Commonwealth's claim that the defendant struck or pushed the members of the [deceaseds'] group first." The printed record shows that another witness for the Commonwealth, George Mioff,

testified (p. 169a) as follows: "Q. Up to this time [i.e., when defendant drew his revolver] did you see anybody do anything at all to George Minoff? A. Nothing, absolutely nothing, nobody touched him at all."

The appellant charges error in the trial court's admission of testimony of an alleged threat by the defendant to harm a member of the church at a meeting six months before the offenses charged in the indictments and further error in the court's later refusal to strike out such testimony. The witness, one Achko Dimoff, testified that at a congregational meeting in the hall in September 1947, at which the bishop was present and the calling of the priest from Bulgaria was the subject of discussion, he (Dimoff) and Traiko Minoff, a brother of the defendant, had some words and that, as Dimoff left the hall, Traiko and George Minoff (the defendant) grabbed him, George saying that he was going to fight and that "I don't have my gun with me. If I would have my gun I would shoot." Several persons took hold of Traiko and George Minoff to restrain them, one such being Boris Mioff, one of the later victims, and another a brother of Koche Atzeff, the other victim. Evidence of a prior offense or occurrence, if related to the offense for which the defendant is on trial, may be admitted to show malice, motive or intent. See *Shaffner v. Commonwealth*, 72 Pa. 60, 65; *Commonwealth v. Ferrigan*, 44 Pa. 386, 387-388; and *Commonwealth v. Levinson*, 34 Pa. Superior Ct. 286, 291. Here, the evidence of the prior threat was admissible to show the *quo animo* of the defendant under like mental stimulus toward certain persons with respect to a particular subject. It could, moreover, help establish a specific resentment of the defendant for Boris Mioff. Nor was the competency of the testimony impaired by the lapse of time since its utterance: cf. *Sayres v. Commonwealth*, 88 Pa. 291, 292-293, 309. The continuity of the conflict was un-

broken. The congregational meeting on April 4, 1948, was the first meeting at which the call of the priest from Sofia was considered after the September 1947 meeting at which the threat had been made; there had been only one other congregational meeting in the meantime (February 1948).

It was not error for the court to read to the jury, along with the defendant's requests for instructions that were affirmed, those that were refused. It is the usual and, ordinarily, the better practice for a trial court not to read refused requests for instructions (see *Commonwealth v. Clark*, 3 Pa. Superior Ct. 141, 148; cf. also *Commonwealth v. McManus*, 143 Pa. 64, 22 A. 761, and *Commonwealth v. Swallow*, 8 Pa. Superior Ct. 539, 610), but no case has been cited us which holds that it is error for a court to do otherwise. The course pursued in the instant case did the defendant no harm. Of the large number of requests for instructions which the defendant submitted, most were affirmed. Only four (Nos. 12, 13, 14 and 15) were refused. No. 12 was an incorrect statement of the law as to the drawing of an inference from the defendant's possession of the revolver. In addition to refusing the point, the learned trial judge went on to state correctly the law in such regard. Points 13 and 14 were for peremptory directions that the defendant's guilt could not be greater than murder in the second degree (No. 14) or voluntary manslaughter (No. 13), while point No. 15 was for a directed verdict of acquittal. The learned trial judge read these requests and refused them for the reason, as he contemporaneously told the jury, ". . . the determination of the guilt or innocence of the defendant, and the degree of guilt, is entirely for the jury to determine." We are unable to see how the defendant could possibly have been harmed by that answer.

The appellant's seventh question relates to what had been the subject matter of his motions in arrest of judgment, viz., the form of the verdicts. The complaint lacks substance and overemphasizes formality. When the jury returned with its verdicts, the following took place,—The Clerk: "Jury, please rise. How do you find George Minoff, guilty of the felony and murder, or not guilty?" The Foreman: "Guilty." The Clerk: "The penalty?" The Foreman: "Death." It is obvious that the verdict, as thus first given orally by the foreman, did not specify the degree of murder whereof the jury found the defendant guilty; and, in that respect, the verdict was deficient: see Act of 1939, supra; and *People v. Lee Yune Chong,* 94 Cal. 379, 29 P. 776; cf. also *Commonwealth v. Johnson,* 359 Pa. 287, 292, 59 A. 2d 128. However, if there is a mistake in the verdict as orally given by the jury in open court, it may be corrected until officially recorded. In *Walters v. Junkins,* 16 S. & R. 414, 415, this court said,—"After the jury have rendered their verdict, it is read to them, that they may say, whether the court have recorded it according to their finding. If any mistake should have occurred, it may be immediately corrected." And, further on,—"The law allows the jury all reasonable opportunity, before their verdict is put on *record,* and they are *discharged,* to discover and declare the truth according to the judgment." When, in the instant case, the clerk read back to the jury that they had found George Minoff ". . . guilty of murder in the first degree, and penalty death" and inquired "so say you all?" the jury answered in chorus "Yes." But, the clerk's statement failed to differentiate the indictments and there could, possibly, have been two different verdicts. Notwithstanding that the clerk had prefaced his inquiry by admonishing the jury in the words of the time-honored phrase to "Harken unto your verdict as the Court hath it recorded,"

no verdict had, as yet, been recorded by the court. Immediately thereafter, the clerk read to the jury their verdicts, as recorded on the verdict slips which the jury had filled out, wherein the jurors collectively declared that they found the defendant guilty of murder in the first degree with penalty of death on each of the two indictments. And, upon being asked by the clerk whether it was the verdict of all of them, the jury answered in chorus "Yes." While a verdict slip is no part of the record, it affords in the first instance a facile and ordinarily accurate way for the jury to inform the court of its true finding. The use which the verdict slip thus properly serves had this court's express approval over a hundred and twenty-five years ago as a "safe and convenient" practice: *Dornick v. Reichenback,* 10 S. & R. 84, 89-90. Subsequently, the jury was polled in both cases, at the request of defendant's counsel, and each juror announced separately on each indictment that he or she found the defendant "guilty; penalty death." It was not until the polling of the jury had been completed that the trial judge then said "Let the verdict be recorded." It is not open to reasonable question that the verdicts so received and recorded represented the jury's true findings. And, no right of the defendant was either denied or abridged. The case of *Commonwealth v. Scovern,* 292 Pa. 26, 36, 140 A. 611, whose facts are substantially on all fours with the present, confirms that the verdicts in this case, as recorded, were taken in due legal form.

The appellant's last point is raised in this court for the first time. On the basis of our recent decision in *Schofield Discipline Case,* 362 Pa. 201, 66 A. 2d 675, the appellant ascribes error to the trial judge because he told the jury,—"You are the sole judges of the law and the facts in the case, taking the law as the court gives it to you as the best evidence of that law." As recognized by Mr. Justice LINN for this court in the *Schofield*

case, all that such a statement does is put ". . . beyond question [the jury's] right to return a general verdict, nothing more." Nor is there any reason to infer that the jury ignored the law when they were directly instructed to take ". . . the law as the court gives it to you as the best evidence of that law." The verdicts were in strict keeping with both the law and the evidence; and, as the record discloses, the ingredients necessary to constitute murder in the first degree were proven to exist: see Act of February 15, 1870, P. L. 15, Sec. 2, 19 PS § 1187. All assignments of error are overruled.

Judgments and sentence affirmed.