JUAN RIVERA APONTE, PLAINTIFF-APPELLANT, v. STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.

Argued June 1 and 2, 1959—Decided July 10, 1959.

*Mr. Nathaniel Rogovoy* argued the cause for plaintiff-appellant (*Messrs. Nathaniel Rogovoy* and *Paul Van Embden,* attorneys; *Mr. Nathaniel Rogovoy,* of counsel).

*Mr. N. Douglas Russell,* Assistant County Prosecutor, argued the cause for defendant-respondent (*Mr. Joseph H. Tuso,* County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. Juan Rivera Aponte, a native of Puerto Rico, migrated to New Jersey in August 1953 and obtained work as a farm laborer at Vineland. Early in 1956, to improve himself, he wrote for an English-Spanish dictionary. In response, he received advertisements of books on black magic. He purchased them, and thus began a bizarre and macabre story.

He learned that if he prepared a magic circle he could summon the devil who would fulfill his wish. What he wanted was a woman who would be his alone. It is the Faustian theme. The vital ingredients of the magic circle, described by the author as "all these horrible and difficult to get objects," included "the cranium of a murderer." Aponte apparently understood that the skull of one who met a violent death would satisfy the text. He pondered how to obtain one. He explained that, being unaware of cemetery practices in the United States, he decided not to play the ghoul lest he become involved with the law. Instead, on October 13, 1956, he killed a 13-year-old boy, buried the body, and seven months later claimed the skull. Having thus acquired "the most important, the principal thing," he thought "I would be able to directly put myself into communication with the devil, person to person." He incanted the prescribed words, but nothing happened. He then tried to obtain "some sort of powder" of which he had read in one of the books, whereby "you could gain the love of a woman but I never got to make it." He failed because the local pharmacy required a prescription. "I

thought I would take it out in someone else's name but that I would get caught in some sort of mix-up, a crime, and I did not want to do that. I returned without my medicine. From there and from then on was born my loss of hope in what I was trying to gain."

Faithful to the book, Aponte throughout the period drank heavily of rum and wine. When his failure became evident he thrust aside the bottle and black magic, "and I was disgusted and I said to me, to myself, 'I am not going to gain anything by this. I am losing time and, who knows, my life.'" After two weeks of reflection, he returned to drink and decided to reveal the murder, but "I was afraid to go directly to the police and tell them I did it." Instead, he planned to have some trouble with his employer "and when the farmer calls the police I will tell the police everything." He precipitated the scene he contemplated, but instead of telling all, he charged he had seen his employer kill the boy. The employer and Aponte were arrested, and when the cries of the wife of the employer "entered my body like a spear," Aponte felt sorrow and his injustice to the employer. Two days later he confessed.

Aponte was indicted for murder. Upon his application, a hearing was held to determine his then sanity as well as his sanity at the time of the homicide. The jury found him sane on both critical dates. We granted certification to review the resulting judgment. 29 *N. J.* 278 (1959).

We merely sketch the psychiatric proof. Two experts on behalf of Aponte found him to be suffering from schizophrenia, characterized by one as the catatonic paranoid form and by the other as paranoidal; committable because of homicidal and suicidal tendencies; and legally insane at the time of the murder. The testimony for the State, synthesized, was that Aponte is and was sane, medically and legally; that his faith in black magic is in kind indistinguishable from faith in the tenets of various cults or in horoscopy. The testimony was that the book was simply his "bible,"

and if he had had greater education (his schooling totalled four years), he probably would have rejected its thesis. The State's doctors found no delusions, since Aponte had merely through ignorance subscribed to an existing text. Reference will later be made to the testimony concerning capacity to stand trial.

## I.

Aponte urges a number of grounds for reversal. Some relate to the definition of insanity as a defense and may be quickly disposed of. He seeks a review of the *M'Naghten* rule. This issue is concluded by our recent decision in *State v. Lucas*, 30 *N. J.* 37 (1959). He complains also of the court's charge with respect to intoxication. The issue here was insanity as a defense rather than the impact of intoxication upon the degree of homicide. There was no evidence of insanity caused by continued use of alcohol. The court's charge was correct. *State v. White*, 27 *N. J.* 158 (1958).

The substantial questions relate to the conduct of the prosecutor and to the court's charge with respect to the consequences of a finding of sanity.

In his summation, the prosecutor said:

"I live with these cases. When I try a case I try it to win, not to lose. And if I thought it was a loser I would try some other means to get out of the case."

It is clearly improper for a prosecutor to state his personal belief if the import is or may be that it is based upon facts not before the jury. *State v. Butler*, 27 *N. J.* 560, 606 (1958); see also *State v. Orecchio*, 16 *N. J.* 125, 140 (1954). A statement indistinguishable from the one before us was deemed to have that import in *State v. McCormack*, 93 *N. J. L.* 287, 289 (*Sup. Ct.* 1919), affirmed on opinion below, 94 *N. J. L.* 262 (*E. & A.* 1920). To the same effect, see *People v. Edgar*, 34 *Cal. App.* 459, 167 *P.* 891 (*D. Ct.*

*App.* 1917); *Broznack v. State,* 109 *Ga.* 514, 35 *S. E.* 123 (*Sup. Ct.* 1900); *Josey v. State,* 89 *Ga. App.* 215, 79 *S. E.* 2d 64 (*Ct. App.* 1953); *State v. Gunderson,* 26 *N. D.* 294, 144 *N. W.* 659 (*Sup. Ct.* 1913); *State v. Accardo,* 129 *La.* 666, 56 *So.* 631 (*Sup. Ct.* 1911); *People v. McGuire,* 89 *Mich.* 64, 50 *N. W.* 786 (*Sup. Ct.* 1891); *State v. Thayer,* 124 *Ohio St.* 1, 176 *N. E.* 656, 75 *A. L. R.* 48 (*Sup. Ct.* 1931); *Childs v. State,* 13 *Okl. Cr.* 461, 165 *P.* 622 (*Crim. Ct. App.* 1917); *Commonwealth v. Ronello,* 251 *Pa.* 329, 96 *A.* 826 (*Sup. Ct.* 1916); *Hickerson v. State,* 162 *Tex. Cr. R.* 446, 286 *S. W. 2d* 437 (*Ct. Crim App.* 1956); see *Annotation,* 50 *A. L. R. 2d* 766, 772 (1956).

As pointed out in *Butler,* a statement of opinion even if expressly based upon the evidence, is proscribed by *Canon* 15, although a violation of the canon may not in itself constitute a basis for reversal (27 *N. J.,* at *p.* 607). We need not consider the issue thus left open in *Butler* since, in the absence of a statement that the prosecutor's view is based upon the proof in the case, we cannot fairly assume the jury would so have understood it.

Counsel objected to the prosecutor's remark. The trial court did not categorically instruct the jury to disregard it. It is not clear that the comments of the court would have been so understood. In the circumstances, we feel the prejudicial effect of the prosecutor's conduct was not eradicated.

█ In his summation the prosecutor addressed some of the jurors by name, and referred to their specific religious faiths which he said he knew from his investigation. He was in error as to the faith of one, which led the juror to correct him. To address jurors individually or by name is generally disapproved and correctly so. *Annotation,* 55 *A. L. R. 2d* 1198 (1957). Counsel for Aponte protested. Again the trial court's statement did not directly meet the situation. If this were the sole issue in the case, it is doubtful that reversible harm could be found. It, however, is a circumstance which lends some weight to the

result we feel compelled to reach. See *State v. Orecchio, supra* (16 *N. J.*, at *p.* 129).

█ The remaining question is whether the trial court's charge diminished the jury's sense of responsibility with respect to the issues submitted to it. The hearing was conducted under *N. J. S.* 2A:163-2 which provides that if the person is found to be sane at the time of the crime, he may nonetheless relitigate the issue in defense of the indictment. The jury was not concerned with the consequences of its finding. The trial court, however, read the provisions of the statute dealing with the sequelae of findings of sanity and insanity at the time of the crime. It then restated the consequences in a discourse covering one and a half printed pages, in which the theme was stated and restated that if the jury found Aponte sane, another jury would reconsider the issue in the murder trial. Counsel in his objection did not suggest it was improper to acquaint the jury with the subject, but rather protested against the heavy emphasis placed upon it.

We see no reason why the jury should be told that a finding of sanity at the time of the crime could be overcome by the view of another jury. The thesis was not only submitted; it was quite heavily stressed. An instruction which thus dilutes the jury's consciousness of responsibility is harmful error. *State v. Mount*, 30 *N. J.* 195 (1959); *State v. White*, 27 *N. J.* 158, 170–179 (1958). The impact of the instruction was here heightened by the fact that it followed in the wake of the prosecutor's improper appeal in summation (to which, we note, Aponte did not object):

"* * * Let him stand before a jury and defend himself on that charge of murder. Don't, for God's sake, don't let him get away with it. Let him tell that jury that he is insane when he is tried on the murder charge. Don't let this man who chopped the little boy's head off, don't let this man who killed this little boy, don't let him get away with this. He has been in jail for some 14 or 15 months. Is this punishment for the crime that he committed?"

A difficult question is whether the judgment should nonetheless be affirmed because of lack of evidence to justify a finding in favor of Aponte. We will return to this question in the discussion which follows:

## II.

"Insanity" has many meanings. A man may be insane for one purpose and sane for another. For present purposes, three concepts should be distinguished:

■ 1. As a defense to crime, it must be proved that the accused was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act, or if he did know it, that he did not know what he was doing was wrong. *State v. Lucas, supra* (30 *N. J.* 37).

■ 2. For the purpose of commitment to a mental institution, insanity usually comprehends any disease or disorder of the mind which renders its victim dangerous to himself or to others. *In re J. W.,* 44 *N. J. Super.* 216, 221 (*App. Div.* 1957), certif. denied, 24 *N. J.* 465 (1957); *In re Heukelekian,* 24 *N. J. Super.* 407, 409 (*App. Div.* 1953).

■ 3. As a test of ability to stand trial on a criminal charge, insanity means a mental illness or condition which prevents the accused from comprehending his position and from consulting intelligently with counsel in the preparation of his defense. *State v. Lucas, supra; State v. Gibson,* 15 *N. J.* 384, 388 (1954); *State v. Auld,* 2 *N. J.* 426, 435 (1949); *State v. Noel,* 102 *N. J. L.* 659, 668 (*E. & A.* 1926); *State v. Peacock,* 50 *N. J. L.* 34, 36 (*Sup. Ct.* 1887), reversed on other grounds, 50 *N. J. L.* 653 (*E. & A.* 1888).

■ The proceedings here were conducted under *N. J. S.* 2A:163–2, applicable to a person in confinement under commitment, indictment or any process. It provides that if such person "shall appear to be insane" the judge "may,

upon presentation to him of the application and certificates as provided in *Title* 30, *Chapter* 4," institute an inquiry as to the mental condition of such person, and try the issue himself or with a jury "as the judge in his discretion may determine." It adds: "It shall be competent for the judge if sitting without a jury, or the jury, if one is impanelled, to determine not only the sanity of the accused at the time of the hearing, but as well the sanity of the accused at the time the offense charged against him is alleged to have been committed." If the second issue is tried and insanity at the time of the offense is found, "the charge against him shall be dismissed on this ground," but a finding of sanity "shall not preclude the accused from interposing the defense of insanity at any subsequent trial of the offense charged."

The statute does not define present insanity or insanity at the time of the offense. The evident purpose was to establish a procedure for trial of the issues and to provide for the disposition of the person. It was not intended to establish a single concept of insanity for the several issues which may be tried. The judicial definitions stated above were not disturbed; they control substantively the respective issues to which they pertain.

Some confusion or misconceptions appear to have arisen with respect to (1) the nature of the showing to be made upon an application for a trial of the issue of capacity to defend, and (2) the circumstances under which there should be conjoined the additional issue of insanity at the time of the offense.

With respect to the first, the origin of the confusion seems to be the provision of *N. J. S.* 2*A* :163–2 that the court may act upon presentation of the application and certificates provided in *Title* 30, *chapter* 4. The title and chapter so referred to deal with civil commitment with respect to which the test is insanity rendering the individual dangerous to himself or to others. Counsel for Aponte presented an application with that showing but devoid of a suggestion of

inability to stand trial. Indeed, in the examination of his experts he did not touch the subject of capacity for trial, nor did the prosecutor on cross-examination. It was the trial judge who interrogated Aponte's witnesses on that topic. Although the moving papers were framed as just stated, yet it is clear that the purpose of counsel was not to seek a civil commitment but rather to obtain a judgment that Aponte was mentally unfit to stand trial on the indictment. We can only surmise that it was believed that insanity justifying commitment would itself dispel capacity to defend against a criminal charge.

█ The fact that an accused may be committable civilly by reason of the suicidal or homicidal tendencies here claimed does not of itself establish inability to stand trial on an indictment. Thus in *State v. Noel, supra* (102 *N. J. L.,* at *p.* 671), the fact that the defendant had been committed to a mental institution did not bar the criminal trial, the court observing:

"* * * The fact that a person has been adjudicated a lunatic does not mean that he is exempt from prosecution for the commission of a crime. Insane persons may be adjudicated insane and be committed for the protection of the public against violence, or for the care and cure of the person committed, or for the conservation and management of the lunatic's property. A regular inquisition is not conclusive. In cases of confinement, where the confinement is made for the protection of the public or for the care of the individual, the commitment is evidential of nothing more than a condition justifying the confinement. A commitment adjudges no more than that it is necessary to confine the patient for the good of the public or himself, or both. The fact that a person has been committed as insane has no necessary relation to the question whether such a person can intelligently go to trial for a crime. Persons having some forms of insanity are as responsible for crimes committed by them as normal persons. It was not error to put the defendant to a trial merely because he had been committed to a hospital for the insane."

To the same effect is *State v. George,* 108 *N. J. L.* 508 (*E. & A.* 1932). The proposition has ample support elsewhere. In *Lyles v. United States,* 103 *U. S. App. D. C.* 22,

254 *F. 2d* 725, at *page* 729 (*D. C. Cir.* 1957), *certiorari* denied, 356 *U. S.* 961, 78 *S. Ct.* 997, 2 *L. Ed. 2d* 1067 (1958), the court observed:

"* * * He may have a mental disease, and the mental disease may have been the cause of his criminal act, and he may be suffering from the same disease at the time of his trial; but it is a scientific fact that he nevertheless may be competent to stand trial under this definition of competency. A paranoiac or a pyromaniac may well understand the charges against him and be able to assist in his defense. 'To assist in his defense' of course does not refer to legal questions involved but to such phases of a defense as a defendant usually assists in, such as accounts of the facts, names of witnesses, *etc.* * * *"

See also *Annotation, 3 A. L. R.* 94 (1919); *Higgins* v. *McGrath,* 98 *F. Supp.* 670 (*D. C. W. D. Mo.* 1951), affirmed *sub nom. Higgins v. United States,* 205 *F. 2d* 650 (9 *Cir.* 1953), petition for *cert.* dismissed, 346 *U. S.* 870, 74 *S. Ct.* 134, 98 *L. Ed.* 379 (1953); *In re Buchanan,* 129 *Cal.* 330, 61 *P.* 1120, 50 *L. R. A.* 378 (*Sup. Ct.* 1900); *In re Dennis, Cal.,* 335 *P. 2d* 657 (*Sup. Ct.* 1959); *People v. Burson,* 11 *Ill. 2d* 360, 143 *N. E. 2d* 239 (*Sup. Ct.* 1957); *Marx v. State,* 236 *Ind.* 455, 141 *N. E. 2d* 126 (*Sup. Ct.* 1957); *State v. Bruntlett,* 240 *Iowa* 338, 36 *N. E. 2d* 450, 459 (*Sup. Ct.* 1949) (concurring opinion); *State v. Severns,* 184 *Kan.* 213, 336 *P. 2d* 447 (*Sup. Ct.* 1959); *State ex rel. Sollars v. Eighth Judicial District Court,* 71 *Nev.* 98, 281 *P. 2d* 396 (*Sup. Ct.* 1955); *State ex rel. Townsend v. Bushong,* 77 *Ohio App.* 464, 68 *N. E. 2d* 226 (*Ct. App.* 1945), affirmed 146 *Ohio St.* 271, 65 *N. E. 2d* 407 (*Sup. Ct.* 1946).

Thus the moving papers were inadequate. We so note, not to suggest a fatal procedural failure, but rather to stress for future guidance that there should appear "substantial evidence of the existence of a degree of mental disorder which would unfit the defendant" from standing trial. *State v. Peacock, supra* (50 *N. J. L.,* at *page* 36). We gather from the trial court's remarks on

the motion for a new trial that the application was made after the court itself had concluded a hearing should be held upon the basis of information which had already reached it. It was within the province of the court on its own motion to direct the inquiry. *State v. Peacock, supra* (50 *N. J. L.,* at *page* 36); *State v. Auld, supra* (2 *N. J.,* at *page* 435); *State v. Gibson, supra* (15 *N. J.,* at *page* 388).

[12] A further misconception seems to be that the existence of an issue as to capacity to defend should in the ordinary course lead to a common trial of that issue and the issue of legal insanity at the time of the offense. Such is not the legislative scheme. Prior to the revision of *Title* 2 in 1951, the question of capacity to defend was determined in a common-law proceeding, as stated in the decisions cited in the paragraph above. There was, and remains, statutory authority to commit one charged with or convicted of crime on the basis of insanity rendering him dangerous to himself or to others. *R. S.* 30:4–82. There was also *R. S.* 2:190–17, which dealt with the disposition of one who escaped indictment or conviction on the ground of insanity at the time of the offense. What was lacking was a procedure for an inquiry into insanity at the time of the crime in the situation in which an accused was found unable to defend. By the revision of 1951, a procedure for that purpose was established in harmony with a recommendation in the 1950 *Report* of this court's Committee on Improving the Administration of Criminal Justice. The reason for the proposal was that, when an accused is found unable to defend, he may be returned for trial on the indictment years later after "much of the evidence pertinent to the issue of insanity at the time of the offense may have been lost." Hence it was recommended that discretionary authority exist for the trial of the latter issue in a preliminary proceeding under terms which would not prejudice the accused, *i. e.,* a dismissal of the indictment if he is adjudged to have been insane at the time of the crime, and otherwise a right to retry the issue under the indictment.

In enacting *N. J. S.* 2A:163–2 and 3, the Legislature adopted the Committee recommendation. It also included therein the provisions of *R. S.* 2:190–17 with respect to the disposition of offenders acquitted by reason of insanity, and inferentially embraced the common-law procedure for the trial of the issue of capacity to defend. It left undisturbed *R. S.* 30:4–82 which, as stated above, deals with commitment on the basis of danger to the accused or to others.

*N. J. S.* 2A:163–2 and 3 were not intended to permit an accused to by-pass the criminal trial if he is able to defend, or to entitle him to a trial run of his defense of insanity by the expedient of asserting incapacity to defend. Rather the purpose was to permit a termination of the criminal proceeding *if the accused is unfit for trial.* Nor does the statute require a trial of the defense of insanity at the time of the inquiry into ability to stand trial. See *State v. Stern,* 40 *N. J. Super.* 291 (*App. Div.* 1956). For that matter, the court need not order a trial of the defense at all. And if the accused is found to be fit for trial, the issue of insanity at the time of the crime should not be adjudged, and if both issues are tried together with a jury, the jury should be so instructed. This is especially true since, as pointed out in *Gibson, supra* (15 *N. J.,* at *pp.* 388-89), the proceeding under *N. J. S.* 2A:163–2 is deemed to be civil and determinable by the vote of ten jurors.

Hence, a court should not deal with the defense of insanity until after the incapacity of the accused to stand trial has been established, unless from the facts on hand it is virtually certain that incapacity to defend will be found. Rather, it should first try the issue of capacity for trial, and although both by our case law and the statute it may sit with a jury, we think it ordinarily more appropriate that that issue be tried by the court alone. If incapacity is found, then, in its discretion, the court may, alone or with a jury, inquire into the defense of insanity.

In the present case the proof at the trial was formidable on the issue of insanity at the time of the homicide. The

proof, however, with respect to incapacity to stand trial was extremely meagre. As already stated, it was adduced on Aponte's case solely upon the instance of the trial court. The following was thereby revealed.

Dr. Brancale testified Aponte's illness has its peaks and valleys. He said "this man certainly knows his attorney, knows the psychiatrists that have examined him, and he remembers the date and knows he is on trial. But underneath all of this I do not think there is a real comprehension of the dilemma." He conceded that Aponte answered questions "at a reasonably intellectual level" and the answers were "responsive," although the witness added, "I think he was beginning to get irrelevant material in there." In answer to specific questions as to whether Aponte could intelligently consult with counsel and plan his defense, the witness said his opinion was "guarded," but he did not venture a negative answer.

Dr. Brunt, on the trial judge's interrogation, said Aponte "intellectually" comprehended his situation, but not "emotionally"; that his answers were "intelligently responsive," but "emotionally he is not involved in this in any way whatsoever"; that he could consult with counsel "In a limited way, or in the limited framework of intelligence." In summary, the doctor stated his "guarded" view was that "Intellectually, and as the Judge asked me, he can answer questions intelligently and at the same time his emotional disturbance is such that he would not give or be able to present an adequate defense or help his lawyer because his emotions would not allow him to do so."

The state's experts, as noted above, found no evidence of insanity, present or at the time of the crime, and hence no impairment of capacity to defend.

Aponte's testimony itself gives no evidence that he could not fairly stand trial. We find therein nothing to suggest that he is unaware of his position. His memory was precise with respect to the homicide and his conduct before and since. His testimony was vivid. He was responsive. There

was some ambiguity as to whether years ago he drank Lysol by mistake or with intent to destroy himself, and Aponte did dispute most of the alleged record of legal involvements in Puerto Rico. The two items just mentioned, if attributable to mental illness, present no barrier to a full, fair and impartial trial. The psychiatrists were evidently able to obtain the data they needed and Aponte's counsel was able to secure the full story of the homicide and a rather complete picture of his background.

Upon the dry record, we would incline to find Aponte able to stand trial, and upon that view we would affirm notwithstanding the errors found in "I" above. We however hesitate to do so because we did not see the witnesses and do not have the benefit of the views of the trial judge who did. Hence we believe we should reverse and remand the matter. We suggest that in the absence of some unusual circumstance not disclosed in the record the trial court should itself try the issue of capacity to defend. If it finds Aponte incapable of standing trial, then the court may itself sit or in its discretion impanel a jury to decide the issue of insanity at the time of the crime.

The judgment is reversed and the matter remanded for further proceedings not inconsistent with this opinion.

*For reversal*—Chief Justice WEINTRAUB, and Justices BURLING, JACOBS, FRANCIS, PROCTOR, HALL and SCHETTINO —7.

*For affirmance*—None.