199 N.J. Super. 329 (1985)
489 A.2d 715
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
SAMUEL VERDUCCI, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 29, 1985.
Decided February 20, 1985.
*330 Before Judges MICHELS, PETRELLA and BAIME.
*331 Janet Berberian, Assistant Prosecutor, argued the cause for appellant (George L. Schneider, Essex County Prosecutor, attorney; Hilary L. Brunell, Assistant Prosecutor, on the brief).
Thomas C. Brown argued the cause for respondent.
PER CURIAM.
This is an appeal from an order entered by the Superior Court, Law Division reducing defendant's custodial sentence because of illness and releasing him pursuant to R. 3:21-10(b)(2). The trial judge's decision was based upon expert psychiatric testimony which disclosed a substantial likelihood that defendant would attempt to commit suicide were he to remain incarcerated. The State contends that defendant poses a substantial potential threat to the public and that the trial judge mistakenly exercised his discretion. We agree and reverse.
The salient facts are not in serious dispute. Defendant has an extensive record of delinquency both as a juvenile and as an adult. On July 21, 1978, defendant was sentenced to concurrent 12 month terms for atrocious assault and battery and obstruction of justice. Defendant subsequently escaped from the Essex County Corrections Center and was ultimately apprehended in Ohio. Upon his return to New Jersey, defendant entered pleas of guilty to assault with an offensive weapon and escape. For those offenses, defendant was sentenced to an aggregate term of not less than three nor more than five years in New Jersey State Prison. The sentences were to run consecutively to the custodial term remaining on the prior charges. Defendant's motion for a reduction of sentence was subsequently granted and he was placed on probation.
The offenses which are the subject of this appeal were committed while defendant was under probationary supervision. On April 3, 1980, defendant forcibly entered Makar's Jewelry and Gift Shop and robbed the owner at gunpoint. Although the record pertaining to this offense is somewhat sketchy, it is undisputed that defendant fired a shot at the victim narrowly *332 missing him during the course of the robbery. The record reflects that defendant threatened to kill the victim and made off with approximately $30,000 worth of gold jewelry and $1000 in cash.
Defendant ultimately entered pleas of guilty to first degree robbery (N.J.S.A. 2C:15-1) and unlawful possession of a handgun (N.J.S.A. 2C:39-5b). Defendant also pleaded guilty to a separate indictment charging him with theft by receiving stolen property (N.J.S.A. 2C:20-7) and unlawful possession of a firearm (N.J.S.A. 2C:39-5b). While awaiting disposition of charges pertaining to his violation of probation, defendant escaped from the holding cell adjacent to the courtroom and fled to Florida where he was ultimately apprehended after committing the crime of grand theft.
On March 26, 1982, defendant was sentenced to an aggregate custodial term of 15 years. Under the sentences imposed, defendant was to serve a term of four years before being eligible for parole. Unfortunately, the record discloses that defendant has abjectly refused to comply with prison rules from the very commencement of his incarceration. His encounters with prison officials need not be recounted at length. Suffice it to say, defendant's derelictions have been substantial and include possession of a weapon, abusive conduct, fighting and attempted escape. It is undisputed that defendant's misbehavior has resulted in his being placed in administrative segregation for the greater part of his incarceration.
The record clearly reveals defendant's apparent inability to cope with the realities of prison life. Uncontradicted evidence was presented that defendant made a serious attempt at suicide and came perilously close to succeeding. Apparently, this problem is not of recent vintage. The record reflects that defendant made a similar attempt several years ago when he was incarcerated for another offense. Whatever its etiology, it is beyond dispute that the risk of suicide is real.
*333 On December 10, 1984, defendant moved for a reduction of sentence pursuant to R. 3:21-10(b)(2). Defendant contended that he suffered from a mental disease or emotional illness which rendered him incapable of conforming to prison life. It was alleged that defendant presented a major suicidal risk. In support of that claim, Dr. Thomas Latimer, a psychiatrist, testified that defendant was a "prime candidate" for suicide because of his "severe" psychiatric problems. While acknowledging that defendant was not "actively psychotic" and was neither "delusional" nor "paranoid," the witness ascribed his past misbehavior to a "basic immaturity." According to Dr. Latimer, defendant's illness precluded him from being able to "conform his conduct [to prison rules], to take life seriously [and] to obey the law [and] respect others." Continued administrative segregation over a lengthy period of time had seriously impaired defendant's will to live within the confines of the prison environment. The doctor noted that treatment within the prison system was insufficient and that defendant would benefit from intensive psychotherapy. According to Dr. Latimer, releasing defendant from administrative segregation and placing him in the general prison population might prove beneficial, but it could "increase his suicidal tendencies."
Dr. Steven S. Simring, a psychiatrist, testified on behalf of the State. According to his testimony, "defendant did not suffer from a significant psychiatric illness." Specifically, defendant did not "show psychotic symptomology" in that he did not harbor hallucinations or delusions. Nevertheless, the doctor noted that defendant had "serious psychiatric difficulties" and that he suffered from an "antisocial personality disorder." The witness testified that defendant presented a danger to society because of his "gross immaturity." Dr. Simring stated that defendant could be treated at facilities within the prison system. However, he essentially agreed with Dr. Latimer's assessment that continued incarceration posed a substantial risk of suicidal behavior.
*334 Understandably concerned with the potential danger of suicide, the trial judge placed defendant on probation for five years. Initially, the court directed that defendant be placed in a suitable psychiatric institution as a condition of probation. However, it subsequently developed that for a variety of reasons no hospital would accept defendant as a patient. Nevertheless, Dr. Latimer ultimately agreed to treat defendant on an out-patient basis. The trial judge, thus, directed that defendant receive psychotherapy from Dr. Latimer as a condition of probation. An order releasing defendant from custody was subsequently entered. This appeal followed. Pursuant to the State's application, we stayed the trial judge's decision and accelerated this appeal.
Preliminarily, we note that R. 3:21-10(b)(2) does not distinguish between mental and physical illness. Although the issue is one of first impression, we are entirely satisfied that under appropriate circumstances a custodial sentence may be amended to permit the release of a defendant because of a mental infirmity. Moreover, the provisions of N.J.S.A. 30:4-82 which authorize the transfer of a prison inmate to a psychiatric facility do not necessarily preclude amendment of a custodial sentence to permit out-patient treatment or conditional release. See State v. Carter, 64 N.J. 382 (1974). The statute only authorizes confinement of persons who are a hazard to themselves or others. Aponte v. State, 30 N.J. 441, 455 (1959). It is not a blanket authorization to commit inmates suffering from any condition of mental illness or impairment. State v. Caralluzzo, 49 N.J. 152, 156 (1967). In any event, our Supreme Court has rejected the argument that the "beneficent" provisions of R. 3:21-10(b)(2) should never be indulged when the disease upon which the application is predicated is amenable to treatment within the prison setting. State v. Tumminello, 70 N.J. 187, 193 (1976).
Clearly, the exercise of judicial discretion in this area requires painstaking inquiry and analysis. The humane objective *335 of providing appropriate care and treatment for the mentally impaired must be balanced against the demands of public security. In seeking to accommodate these often countervailing policies, the trial judge should carefully scrutinize the nature of the inmate's mental or emotional illness. Where the pathology from which the defendant suffers poses a serious risk to the public safety, the scale necessarily tips in favor of continued incarceration despite the possibility of adverse psychological effects that might well ensue. In that regard, we emphasize that primary among the hierarchy of governmental objectives is the obligation to protect the citizen against criminal attack. The point to be stressed is that the aim of the law is to guard the innocent from injury by the "sick as well as the bad." State v. Maik, 60 N.J. 203, 213 (1972). Hence, public security must be the paramount goal.
We do not mean to suggest that a mentally ill inmate must be forever warehoused in a prison without exit. Whatever the crime committed, the prisoner is entitled to fair and humane treatment. Where the inmate presents a risk of harm to himself by virtue of his mental infirmity, appropriate action must be taken to protect and treat him. We recognize that this may well be easier said than done. Nevertheless, it is an imperative governmental obligation.
Against this backdrop, we are thoroughly convinced that the trial judge erred in granting defendant's application for amendment of his custodial sentence. While it is true that defendant has already served a substantial portion of the parole ineligibility term imposed by the sentencing court, this circumstance does not by itself warrant immediate release. We note in that regard that parole eligibility does not mandate automatic freedom from custodial restraint. See In re Trantino Parole Application, 89 N.J. 347, 366-369 (1982). In any event, defendant's initial parole eligibility date has been delayed by virtue of his misconduct while in prison. In our view, consideration of all the factors, especially the serious nature of the *336 crimes and the circumstances attendent to their commission, compels the conclusion that the trial judge mistakenly exercised his discretion. State v. Sanducci, 167 N.J. Super. 503, 510 (App.Div. 1979), certif. den. 82 N.J. 263 (1979). Although the court was required to consider the circumstances pertaining to defendant's illness and the conditions under which he is presently incarcerated, the crime committed and the danger to the public attendent to his release should have been given paramount consideration. See State v. Hodge, 95 N.J. 369 (1984); State v. Roth, 95 N.J. 334 (1984). See also State v. Stanley, 149 N.J. Super. 326, 328 (App.Div. 1977) certif. den. 75 N.J. 21 (1977). We are, therefore, constrained to reverse the order amending defendant's custodial sentences. The sentences imposed initially by the trial judge are hereby reinstated.