THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES BURKE *et al.*, Defendants-Appellants.

(No. 53554;

First District—December 14, 1970.

Bellows, Bellows & Magidson, and Weisberg, Zelden, Lebold & Gordon, both of Chicago, for appellants.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and Robert L. Best, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE BURKE delivered the opinion of the court:

Defendants were charged in a three-count indictment with two counts of theft and one count of bribery, all arising out of the same transaction. Trial by jury was waived, and defendants were found guilty at a bench trial on all three counts. Defendants' motion in arrest of judgment was allowed as to one of the theft counts and defendants were sentenced to a term of one year to one year and one day in the penitentiary on the other two counts. They appeal.

At approximately 7:55 A.M., on September 7, 1967, complaining witness Robert Thomas was driving an automobile easterly along Roosevelt Road in Chicago, after having dropped off a lady friend at her place of employment. Thomas, 23 years of age, was about to return to the automobile service station which he managed at 3731 West Roosevelt Road when one of two uniformed Chicago police officers sitting in a marked patrol car parked near the intersection of Loomis Street and Roosevelt Road motioned for him to pull his automobile over to the curb. The intersection was within patrol car beat area 1205 which had been assigned that morning to the defendants, who were Chicago police officers.

Thomas testified that he pulled his automobile to the curb and that when he alighted from the vehicle, he was told by one of the officers to get into the back seat of the patrol car, which he did. Thomas identified defendant Burke as the officer on the driver's side of the patrol car and defendant Keeler as the officer occupying the right front seat of the police vehicle.

Thomas was asked by Officer Burke to produce his driver's license and was told by Burke after examination of the license that it had been revoked; the license was in fact valid. Officer Burke thereupon went to Thomas' automobile, returned to the police vehicle, and told Thomas that his vehicle's windshield was lacking a city sticker and that Thomas "can get into a lot of trouble about this." Thomas testified that the officer also threatened to report him to the oil company for which he worked for having left the station during working hours, which Thomas feared might have led to the loss of his employment.

Officer Burke then asked Thomas how much money he had on his person, and Thomas replied that he had about $75. The officer told Thomas to drop the money on the rear seat, which Thomas did. Officer

Burke then stated to Thomas that since he was the manager of a service station he should be able to raise more than $75. Thomas testified that he drove his automobile to the filling station where he worked, while the two officers followed in their vehicle. Thomas entered the station, received $200 from his assistant station manager, Curtis Lockheart, and returned to the waiting police car.

Thomas testified that upon his return to the police vehicle he 'was asked by Officer Burke where he lived and how much money he had in the bank. Thomas told the officer where he lived and stated that he had about $600 or $700 in the bank. Thomas was driven to his home, was told to get his passbook, and was also told to get some additional cash and a commission check which the officers learned were at the house. Thomas was driven to the bank and was directed by the officers to withdraw all but $153 of the account "so it won't look bad." Thomas withdrew $600 from the account and cashed the commission check, all of which he turned over to the officers. The officers returned to Thomas the $200 which had been taken from the service station so that Thomas "would not get ito trouble with the oil company." Thomas was then taken back to the vicinity of the service station and let out of the patrol car. He walked back to the station and returned the $200 to Lockheart.

Curtis Lockheart testified that Thomas entered the station between 8:00 A.M. and 8:15 A.M. on September 7, 1967 and asked the witness for $200. After receiving the money, Thomas left the station and entered a waiting police car occupied by two officers. Lockheart further testified that Thomas returned to the station with the $200 about 9:15 A.M.

It was undisputed that Officers Burke and Keeler were assigned to beat 1205 on the day in question, between the hours of 7:30 A.M. and 3:30 P.M. There is also evidence that a call was received at 8:02 A.M. at the police communications center taking the radio of beat 1205 patrol car off the air, and that the radio was placed back on the air at 9:18 A.M.

On the day following the incident Thomas telephoned an information service for assistance, which in turn referred to the Internal Inspections Division (I.I.D.) of the Chicago Police Department. Thomas testified that he gave a statement to an investigating officer of the I.I.D. and that he also viewed "maybe fifty or sixty or more" photographs of police officers. He testified that he selected a photograph of Officer Burke; that he selected a second photograph, which he tentatively identified as that of Officer Keeler, "but was not positive"; and that he also selected a third photograph.

Two days after the incident Thomas viewed a line-up consisting of between 17 and 23 uniformed Chicago police officers, including both defendants, but was unable to identify the defendants therein. Thomas

was thereafter taken to a room occupied solely by the defendants, where he again identified Burke, but stated concerning Keeler, "I am not sure about him." It appears that Burke, during the line-up, was wearing eyeglasses, whereas he was not wearing them in the police vehicle two days before. Thomas made an in-court identification of both defendants.

Both defendants testified in their own behalf and denied either seeing Robert Thomas on September 7, 1967, or taking any money from him on that date. In a statement given to investigators from the I.I.D., defendant Keeler related that at approximately 7:30 A.M. on the day in question, he and Burke stopped a traffic violator to whom Officer Burke gave a citation. Keeler related that they then called the police communications center and reported that they were going off the air in that they were taking the violator to the police station to post bond. Keeler also related that this was the reason their car radio was off the air for the indicated period of time.

At trial, however, both defendants admitted that they had not accompanied the violator to the station but that the violator had given the officers a bond card at the scene. They testified that they then used the "off-the-air" time to eat breakfast at St. Luke's Hospital cafeteria, admittedly a violation of Chicago Police Department rules, remaining there in the presence of Chicago Police Officer John Williams until 8:40 A.M. The defendants then proceeded to make routine crossing guard checks at several area schools, after which they returned to their normal patrol, notifying police communications center of their return to duty about 9:15 A.M.

Officer Williams testified for the defense that he had eaten breakfast with the two defendants from about 8:05 A.M. until 8:40 A.M., on the day in question, and that defendants had purchased his breakfast that morning because his birthday was the day before.

Defendants first contend that the State failed to prove their guilt beyond a reasonable doubt. They argue that the identification of the defendants by Thomas was doubtful, and raises a serious doubt of guilt especially when viewed in the light of the defendants' alibi evidence.

Defendants' argument fails to differentiate between Thomas' identification of Burke and his identification of Keeler. The record is clear that Thomas never had any doubts about the identity of Burke, whom Thomas testified did most of the talking and demanding during the incident. Thomas selected a photograph of Burke at police headquarters the day following the incident and also identified Burke after the line-up. It is true that Thomas failed to identify Burke at the line-up, but it appears that during the line-up Burke was wearing eyeglasses, whereas he was not wearing them during the incident two days before. Further, Burke

was positioned among 17 to 23 other uniformed officers in the line-up, an unusually large number of people to be participating in a line-up. These were matters for the determination by the trier of fact.

■■ With regard to Thomas' identification of Keeler, Thomas candidly admitted that he was uncertain of the identification although he did select a photograph of Keeler at the same time that he selected the photograph of Burke. This uncertainty went to the weight and credibility of Thomas' testimony in this regard, and not to the admissibility thereof. (*People v. Holt*, 124 Ill.App.2d 198.) Furthermore, Thomas' identification of Keeler, however uncertain, was strongly corroborated and bolstered by the Chicago Police Department records, and the testimony of the defendants themselves, that Burke and Keeler were assigned to work together on the morning in question.

Also corroborating the evidence adduced by the complaining witness are the police records which show that the defendants were assigned to the beat where the complaining witness testified that the incident commenced and which also show that the radio in the patrol car assigned to the defendants that morning was taken off the air during substantially the same time the complaining witness testified that he was with the defendants, which also closely corresponded to the time periods testified to by Lockheart.

■■ The matters raised concerning Thomas' conflicting testimony relating to the wearing apparel and police insignia of the officers, the markings on the police vehicle, the amount of time spent with the officers, and the like, were likewise for consideration by the trier of fact. Before the trier of fact was the complaining witness' testimony that he was extremely frightened and nervous during the incident, which could account for such conflicting testimony. The evidence is not so improbable or unsatisfactory as to justify a reversal of the convictions. (*People v. Jackson*, 95 Ill.App.2d 28.) (See also *People v. Appleby*, 104 Ill.App.2d 207; *People v. Minor*, 95 Ill.App.2d 447, cited by defendants, which are distinguishable on their facts from the case at bar. There was ample independent evidence linking the defendants with the crime, corroborating the evidence given by the complaining witness.)

Defendants also contend that they were denied due process of law when the court allowed Thomas to identify them in court, since the pretrial confrontations between Thomas and the defendants were unnecessarily suggestive.

It should be noted that this matter was not raised until after the trial of this cause. Neither a pre-trial motion was made to test the question, nor were objections made to the identification testimony at the time it

was given at trial. See *People v. Williams*, 28 Ill.2d 114; *People v. Trefonas*, 9 Ill.2d 92.

Nevertheless, it is clearly borne out by the record that Thomas never had a doubt as to the identity of Burke, as is evidenced by his selection of Burke's photograph the day following the incident. Thomas was with Burke a considerable length of time during the incident, and his attention was quite apparently drawn primarily to Burke, who did most of the talking and demanding during the incident. The record reveals that Thomas' in-court identification of Burke had a pre-trial origin, independent of the later face-to-face confrontation at police headquarters. The proscriptions set out in *United States v. Wade*, 388 U.S. 218, have not been violated.

■■ As to the in-court identification of Keeler, Thomas had earlier stated that he was not certain that Keeler was the other of the two officers involved in the incident and admitted as much at the face-to-face confrontation. The in-court identification of Keeler was not absolutely necessary to sustain the conviction since sufficient independent evidence placed Keeler at the scene on the morning in question, buttressing Thomas' earlier tentative identification of Keeler. See *Harrington v. California*, 395 U.S. 250.

For these reasons the judgments are affirmed.

Judgments affirmed.

McCORMICK, P. J., and LYONS, J., concur.