THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* CHARLES NEWSON, Defendant-Appellant.

(No. 53967; ▇▇▇▇▇▇▇▇

First District—June 23, 1971.

Gerald W. Getty, Public Defender, of Chicago, (John T. Moran and James J. Doherty, Assistant Public Defenders, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle, Assistant State's Attorney, of counsel,) for the People.

Mr. JUSTICE DIERINGER delivered the opinion of the court:

The defendant, Charles Newson, was tried in the Circuit Court of Cook County and a jury found him guilty of rape. He had previously been tried for the same offense, and the trial resulted in a hung jury. The court sentenced the defendant to the Illinois State Penitentiary for a period of seven to twenty-one years.

On appeal defendant raises the following questions: whether the retrial after the first jury failed to reach a verdict constituted double jeopardy and violated the defendant's rights to due process of law, whether the identification of the defendant was the product of unnecessarily suggestive identification procedures, whether the defendant was proven guilty beyond a reasonable doubt, whether the defendant's right to be tried by a fair and impartial jury was violated, whether defendant was denied due process by the prosecution's failure to produce an alleged statement of a witness, and whether the denial of defendant's motion for a continuance denied defendant's right to counsel.

We summarize the facts and events, all of which took place in the City of Chicago. On August 14, 1964, between 2:30 and 4:00 A.M., a 27-year old woman was raped in the back seat of a cab, by its driver. She had gotten into the cab in front of the Hilton Hotel on South Michigan Avenue. The area was well illuminated with street lights and the hotel marquee. As she entered the cab there was a minor disturbance between a man who was just exiting and the cab driver. The driver argued with him for three to five minutes in the presence of the woman.

When the cab reached the immediate vicinity of her home, Mrs. Sams, the prosecutrix, told the driver her residence was straight down the street two more blocks. Instead of continuing on Pratt Avenue, the driver turned north on Ravenswood Avenue and pulled over to the curb near a railroad embankment. Mrs. Sams jumped out, and the driver asked, "Isn't this where you live?" In response to a negative reply, he said he must have made a mistake. Mrs. Sams looked at him to determine whether or not to believe him. She then re-entered and sat on the back seat as before. The driver reached back, as if to close the door, but grabbed her around the throat with his right hand. He then climbed into the back and pinned her to the seat. She began screaming and kept opening the door in an effort to escape, but she was struck many times on the face and head, and then a knife was placed against her throat. She was told to be quiet or her throat, face and eyes would be cut, whereupon he raped her.

Mrs. Sams feigned a heart attack, and the driver said he would take her home, but started driving in the other direction. As the car was moving through the intersection of Clark and Farwell, she jumped out and started running down the street, screaming for help. She was allowed into an apartment, where she called the police. She was taken to St. Francis Hospital in Evanston, where she was treated for bruises and given a pelvic examination, which revealed the presence of live sperm.

She described her assailant to police officers as being a dark complexioned male Negro, between thirty and forty years of age, with a round head, short hair, husky shoulders, wearing a zipper windbreaker jacket and dark pants. She also gave them the number of the cab, which was 1825.

A supervisor for the cab company discovered cab number 1825 abandoned at 45th and State Street. He learned this cab had been assigned to the defendant, Charles Newson. He proceeded to Newson's apartment, where he obtained the keys from Newson's wife, who told him she received the keys, not from her husband, but from someone named Edward.

At about 8:00 A.M. on the day of the crime, a police officer procured two photographs from the cab company, one of the defendant and one of another driver who failed to return his cab on that morning. The two black-and-white photographs of Negro males were shown to Mrs. Sams at the hospital in the afternoon. At the time the officer did not tell her the two men in the pictures were cab drivers. Mrs. Sams picked the defendant's photograph as the man who attacked her. She stated, "This is the man, but I want to look at him in person."

Police officers went to the defendant's apartment where his wife told

them he could probably be found at Letha Parrott's Beauty Shop. Upon arrival at the beauty shop one officer testified they saw a male Negro heading toward a rear doorway. They approached him, showed their identification and asked, "Are you Charles Newson?" The defendant answered, "Yes, what took you so long."

At a hearing on a motion to suppress statements, defendant stated the officers asked if they could search him and did search him. At trial he claimed he was not searched. He further stated he did not know how the knife taken by police officers got into his pocket.

At about ten o'clock in the evening of August 14, 1964, the defendant was taken to the hospital in Evanston to be viewed by the prosecutrix. Before bringing him into the room, Detective Curtin told Mrs. Sams that they had brought somebody for her to look at. Both Mrs. Sams and the detectives stated the room was well lighted. The defendant said he did not know he was in a hospital and that it was so dark he never saw Mrs. Sams or anyone else. Mrs. Sams viewed the defendant standing at the foot of the bed and stated, "That's the man." She was then shown the knife and she identified it as being the one used by the assailant, noting the broken handle.

The defendant testified to an alibi defense. He stated he and Edward Giles left his cousin's beauty shop together at about 11:00 P.M. in his cab. He stopped the car in a bus zone and waited while Giles went into the tavern. After waiting five to ten minutes he went into the tavern to get Giles and left his cab double parked with the keys in the ignition. He talked with Giles in the tavern, and Giles said he would be right back. Newson exited in time to see Giles driving his cab away. Newson stated he waited in the tavern until 2:00 A.M. and then went to Giles' wife's house, where he waited for about one-half hour before leaving briefly to purchase some beer. Giles called the apartment between 5:00 and 6:00 A.M. and then arrived twenty minutes later. Upon leaving, Newson said he went to his own house where he observed his cab parked outside, and then went to his cousin's beauty shop to borrow money. He stayed there until his arrest. He also stated Giles had given him the pocket knife in question to use in opening the broken lock of his sister's apartment above the beauty shop, but had given it back to Giles and did not know how he regained possession.

The defendant's testimony was corroborated by Letha Parrott, his second cousin, who also knew Edward Giles very well, since Giles had lived in her home for about eight months. She testified she saw Giles walk through her bedroom about 5:00 A.M., carrying a lady's purse. Several witnesses testified as to the defendant's good character. Newson had never been arrested for any crime other than minor traffic violations.

In rebuttal, Giles testified he noticed Newson's cab parked in front of 4318 South Wentworth Avenue at about 7:00 A.M. The motor was running, so he drove the cab to defendant's house and parked it there, giving the keys to defendant's wife.

Geraldine Smith testified to being in taverns from 9:00 P.M. to 2:00 A.M. on August 13-14, in the company of Edward Giles and the defendant.

On December 16, 1964, defendant's case was submitted to the jury. The jury was unable to reach a verdict, and a mistrial was declared by the trial court. On May 23, 1968, defendant was retried before a jury, which found him guilty of rape. During this period the defendant was on bond, and at one point the bond was forfeited.

At the second trial, one of the jurors indicated to the judge that he had been acquainted with one of the prosecution's witnesses. After a conference, the defense attorney was given a choice of taking an alternate juror, however he elected not to do so.

Defendant's argument concerning double jeopardy was considered by the Illinois Supreme Court in *People v. Nilsson* (1970), 44 Ill.2d 244. At page 246, the court stated:

> "Defendant concedes that thus far the Supreme Courts of both Illinois and the United States have sanctioned the rule that the constitutional prohibition against double jeopardy does not bar a new trial following the declaration of a mistrial because of failure of the first jury to reach a verdict. (*United States v. Perez*, 22 U.S. (9 Wheat.) 579, 6 L.Ed. 165; *People v. DeFrates*, 395 Ill. 439; *Dreyer v. People*, 188 Ill. 40, aff'd 187 U.S. 71, 47 L.Ed. 79, 23 S.Ct. 28.) This proposition is well settled, and we are not disposed to depart from it now. Therefore, in the absence of any abuse or discretion in the trial court's dismissal of the first jury, we find that the subsequent conviction of defendant in a second trial is constitutionally permissible."

The Illinois courts are bound by that decision, and we shall not give further consideration to such argument.

■■ The defendant next alleges that the identification procedures were suggestive to the point of depriving him of due process of law. Within twelve hours of the incident, Mrs. Sams was shown two photographs of male Negroes. She was not told the pictures were of cab drivers. She readily rejected one of the photographs and identified the other as being the assailant. She said, "This is the man, but I want to look at him in person."

The defendant contends that showing Mrs. Sams the two photographs violates the holding of *Simmons v. United States*, 390 U.S. 377. In *Sim-*

*mons,* the court said reversal was in order when the photographic identification procedures were so suggestive as "to give rise to a very substantial likelihood of irreparable misidentification." There was little chance of misidentification in this case because Mrs. Sams had an excellent opportunity to view the assailant and because the photographs were submitted to her within a short time after the incident, when the memory of the assailant was still fresh in her mind. She was given two photographs to look at, which had not been identified in any way. She was free to reject either or both.

■■■ Neither was the showup conducted in a manner which was so suggestive as to raise a substantial likelihood of irreparable mistaken identity. Whether a particular identification procedure amounts to denial of due process depends upon the totality of circumstances surrounding it. (*Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967; *People v. Nelson* (1968), 40 Ill.2d 146.) When the police brought Newson into the hospital room, the officers did not tell Mrs. Sams anything about him, but he was wearing a cap identifying him as a cab driver. However, this cannot be considered prejudicial since she had, in fact, been assaulted by a man driving a cab, and the police in no way indicated their belief that Newson was the guilty person. Also, the knife was not shown to her until after she had identified Newson.

A similar contention regarding the unfairness of a showup was made in *People v. Speck* (1968), 41 Ill.2d 177. In that case the court said:

> "The record shows that Miss Amurao was brought to the defendant's hospital room where he was the only patient in the room. Someone, possibly a police officer, grabbed the defendant's head and turned his face in the direction of Miss Amurao. As she left the room she told a police officer that defendant was the killer. There is nothing in the record to show that the police officers in any way improperly induced the witness to make this identification. The Supreme Court in *Stovall v. Denno,* pointed out that the practice of showing suspects singly to persons for the purposes of identification has been widely condemned, but also pointed out that a claimed violation of due process of law in the conduct of a confrontation depends on the totality of the circumstances surrounding it. We find nothing fundamentally unfair in the identification procedure here. The witness had had an opportunity seldom if ever equalled in any murder case, to observe the killer during the several hours he was in the townhouse, and had identified the defendant's picture before the hospital identification. Our language in *People v. Nelson,* 40 Ill.2d 146, 151, in which a similar claim was presented, is applicable here. We said, 'The defendant's

argument flies in the face of the record which clearly shows that the defendant was identified * * * independently of and uninfluenced by any viewing at the attempted lineup.' "

In the instant case the prosecutrix also had ample opportunity to observe the defendant and had identified a picture of him prior to the showup. Neither were the circumstances of the showup any less fair than in the *Speck* case.

Regardless of what occurred previous to trial, the positive in-court identification by Mrs. Sams was properly admitted as being of an independent origin. *People v. Johnson* (1970), 45 Ill.2d 501; *People v. Davis* (1970), 45 Ill.2d 514.

■■ Next, the defendant urges he was not found guilty beyond a reasonable doubt. He suggests the prosecutrix had an insufficient opportunity to observe and that her capacity to observe was impaired. The facts do not sustain these contentions. When she got into the cab at the Hilton Hotel she was able to observe the defendant under well-lighted condition for several minutes as he argued with the passenger getting out of the cab. She was able to observe him closely when she scrutinized him after he stopped the cab at the wrong place, and she jumped out. Finally, during the commission of the rape she was able to see the defendant's face under lighted conditions, since she kept opening the door which switched on the light in the cab. Defendant's suggestions that the facial blows and natural inclination of a woman to turn away from the face of a rapist, impairing her ability to observe, are mere speculation and do not rebut the prior opportunities she had to observe him previous to the attack.

The defense also commented on the existence of a civil suit by Mrs. Sams against the cab company, which would be in jeopardy if the attacker were someone other than a cab driver. The possibility of bias was thus before the jury when they performed their function of judging the credibility of the prosecutrix.

The defendant also maintains his alibi was not impeached. The testimony of the witnesses was contradictory and the credibility of the witnesses and the weight of the evidence was the province of the jury. The jury was under no obligation to believe alibi testimony over the positive identification of the accused. *People v. Habdas* (1968), 94 Ill.App.2d 330; *People v. Setzke* (1961), 22 Ill.2d 582.

The defendant next contends his right to be tried by a fair and impartial jury was violated when a juror was permitted to remain on the panel after he informed the court that he knew Geraldine Smith, the first rebuttal witness for the State. When Geraldine Smith took the stand, juror John Warco passed a note to the trial judge informing him he knew

the witness. The judge immediately halted examination of the witness and called Warco, defense counsel and the prosecutor into his chambers. Warco stated he did not know Geraldine Smith well, but did recognize her from when she worked for him about four years previous. He said he thought he could be objective about her testimony. The court gave defense counsel the choice of retaining Warco or replacing him with an alternate juror. The defense counsel elected to retain Warco. Neither can it be argued that there is a basic right, which cannot be waived by counsel, to be tried by a jury, none of whom knows any of the witnesses. In many small communities it is not infrequent for the jurors to be acquainted with the parties or the witnesses, or both.

The defendant also contends the prosecution withheld a prior statement of a rebuttal witness and thus precluded its use for impeachment purposes at trial. Geraldine Smith was allowed to testify that she was in the defendant's company on August 13-14 from 9:00 P.M. until 2:00 A.M., part of which time Newson was the driver of the cab in which she and Edward Giles were riding. Newson had testified that his cab had been taken from him by Giles at about 1:00 A.M. and never returned. The defendant charges the possibility of prior inconsistent statements was precluded by the assertion of the State that their files had no such statements. In *Brady v. Maryland,* 373 U.S. 83, the Supreme Court held:

> "The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material to guilt or punishment irrespective of the good faith of the prosecution."

Geraldine Smith testified on cross-examination that she was interviewed by a police officer, but she neither gave nor signed a written statement. Detective Greiner informed the court he was the officer who spoke with the witness, but he could not remember what she told him and there was nothing in the police files regarding the conversation. In *People v. Ross* (1968), 41 Ill.2d 445, the defendant stated the interrogating officers wrote down what he said when he was questioned. Nevertheless, when the State informed the court no formal statement was made that day, and that it had previously given the defense the only statement or material it had in its possession, the court said:

> "We find no denial of access to the witness's statement for impeachment purposes. The court did not deny the defense access to any available records. Although Mauricaux's testimony was that a writing was made on December 2, there was no showing that any writing was in existence nor did the defense seek to probe beyond the contents of the prosecutor's file at the time to determine if any notes or statements were made."

Finally, defendant contends that defense counsel had inadequate time to prepare because the court erroneously denied a continuance and thereby abrogated defendant's constitutional right to counsel. The defendant relies on *Powell v. Alabama,* 287 U.S. 45, in which defense counsel was not afforded time to investigate the facts. The Supreme Court held at page 58:

> "* * * defendants were not accorded the right of counsel in any substantial sense. To decide otherwise, would simply ignore actualities."

However, the facts in the instant case reflect no such denial of preparation. The Public Defender served as counsel for defendant from February 15, 1965, to May 21, 1968. On that date the Public Defender was granted leave to withdraw as counsel for defendant, and Henry McGee, Jr., filed an appearance instanter as counsel for defendant. Upon defendant's motion the cause was continued two days until May 23, 1968, when trial began. The record discloses no additional motion for a continuance, and it is clear that Mr. McGee was allowed to file an appearance only on the condition that he would be ready for trial.

A trial judge has considerable discretion in matters of substitution of counsel and granting a continuance to allow for the presentation of a defense. In *People v. Clark* (1956), 9 Ill.2d 46, the court stated:

> "The granting of a continuance to permit preparation for a case necessarily depends upon the particular facts and circumstances surrounding the request, and is a matter resting within the sound judicial discretion of the trial court. Its decision will not be disturbed upon review unless it is clearly shown that such discretion has been abused."

Therefore, unless it appears from the record that representation by defense counsel was of such low caliber as to amount to no representation at all, defendant's conviction will not be reversed. (*People v. Clark* (1956), 9 Ill.2d 46; *People v. Williams* (1968), 95 Ill.App.2d 421.) A review of the record indicates that defense counsel's effort was that of a competent lawyer.

For the reasons stated, the judgment is affirmed.

Judgment affirmed.

ADESKO, P. J., and BURMAN, J., concur.