HERBERT OSTER, Plaintiff-Appellee, v. THE POLICE BOARD OF THE CITY OF CHICAGO et al., Defendants-Appellants.

(No. 55961;

First District (2nd Division)—September 10, 1974.

*Rehearing denied October 9, 1974.*

Richard L. Curry, Corporation Counsel, of Chicago (William R. Quinlan and Daniel Pascale, Assistant Corporation Counsel, and Teddy S. Gron, Senior Law Student, of counsel), for appellants.

Victor F. Ciardelli and Hugh B. Arnold, both of Chicago (Andrew M. Raucci, of counsel), for appellee.

Mr. JUSTICE LEIGHTON delivered the opinion of the court:

This appeal is to review a judgment that reversed the decision of the Police Board of the City of Chicago by which it ordered Herbert Oster, the appellee, discharged from the Chicago Police Department. The dispositive issue is whether manifest weight of the evidence supports the findings of the Board that Oster, a police department sergeant, used his official position for personal gain.

On May 9, 1969, at approximately 10 P.M., a school teacher and his girlfriend were in his automobile on the North Avenue beach parking lot in Chicago. A flashlight was rapped on a window of the driver's side. And after rolling down the window, the teacher saw it was a police officer and that he was alone. The officer demanded to see the drivers' licenses of the occupants and then returned to a police car that was 50 to 100 feet away with its parking and interior lights on. The teacher followed the officer to the car; and as he reached it, the officer told him he had just notified headquarters that two occupants of an automobile were under arrest for public indecency. The officer questioned the young man, learned his name, his address and that he was a probationary teacher employed by the Chicago Board of Education.

Then, the officer told the teacher that he and his girlfriend needed $50 each for bail money. In answer to this, the teacher said he did not have that amount of cash with him. The officer asked him if he could get the needed sum from a friend or a member of his family. The teacher said he doubted this could be done, but he would inquire of his girlfriend if she had that amount of money. The officer then went with the teacher to the automobile and told the girlfriend of the public indecency charge and the fact that bail bond for them required a total of $100. The girlfriend, after examining her purse, said she had only $2 and her checkbook. She suggested, however, that she could cash a $50 check at the McCormick YWCA where she was living.

During these conversations, the teacher spent at least 30 minutes, and the girlfriend approximately 15, observing the officer's appearance and noting that he spoke with an eastern European accent. When the officer was told that the girl could cash a check at the YWCA, he agreed to follow the couple in his squad car. This was done; the officer parked his car nearby; the girlfriend wrote a check for $50 and took it to a clerk in the McCormick "Y."

In the meantime, the teacher made a telephone call to a friend in the attempt to obtain the needed money from him; but the effort was unsuccessful. While the call was being made, the girlfriend cashed the $50 check, met the teacher outside the building and from there they went to the officer. They gave him the $50. In a short conversation that followed, he told them that he was going to explain his loss of about an hour of duty time by telling his lieutenant "* * * that he gave the kids a pass, because they were from his own neighborhood." Having said that, the officer lectured the teacher and the girlfriend on sexual morality and left with the money.

The following day, the teacher called the Chicago Police Department to complain about the incident of the evening before. However, it was

not until Wednesday, May 18, 1969, that he reached the complaint desk and was asked to come in immediately to give a statement. He did; and thereafter, he and his girlfriend appeared before investigating officers of the department and were interrogated. During this period, they were shown a large number of photographs, estimated to have been in the hundreds, and asked to identify the police officer who had taken the $50 from them during the evening of May 9, 1969.

Among the photographs shown the teacher and his girlfriend were pictures of units in the department. One of the units whose photograph was shown was the one to which Oster belonged. Neither the teacher nor the girlfriend picked out Oster from among the policemen shown in the photograph. On one occasion, in making a tentative identification, the teacher picked out the photograph of a policeman, not Oster. On another occasion, the girlfriend made tentative identifications by picking out the photographs of two officers other than Oster.

Then, on May 28, 1969, at approximately 3 P.M., 4 P.M. and 6 P.M., a watch commander conducted a lineup that was made up of Chicago police officers. And because the officer who was described by the teacher and his girlfriend spoke with an accent, each officer in the lineup was asked to read a card which contained the statement, "You could be charged with public indecency." Oster was only in the 6 P.M. lineup. After viewing all the men in each lineup, the teacher picked him out of the last one as the offending policeman. When the girlfriend viewed that lineup, she came to an Officer Mackin who she asked to repeat the statement at least twice. She continued through the lineup and then picked out Oster as the policeman she said had taken the $50 from her and the teacher. Oster was advised of his rights, but interrogation was terminated when he requested the presence of counsel.

A short time later, the department complaint review panel conducted hearings and made its recommendations. On October 14, 1969, the superintendent of the Chicago Police Department filed with the Police Board charges that Oster had violated Department Rules 2, 4, 13, 29 and 41. The specifications alleged four acts of misconduct which brought discredit upon the Department: (1) that on May 9, 1969, Oster used his official position as a police officer to obtain money for his personal gain from the school teacher and his girlfriend by telling them that $50 was necessary to eradicate their arrest and possible prosecution for public indecency, an offense with which they were allegedly being charged; (2) that on August 5, 1969, when appearing before the Complaint Review Panel of the Chicago Police Department, Oster attributed statements to Officer Patrick Hayes which were false; (3) that on May 9, 1969, Oster left his assigned duties without being properly relieved or

without proper authorization in that he, without permission, left Beat 1882 and proceeded to the vicinity of Oak and Dearborn Streets, the location of the McCormick YWCA, without proper authorization; (4) that on May 9, 1969, Oster discussed bail with persons in his custody by talking with the school teacher and his girlfriend concerning the amount of bond required of them when they were persons then in his custody for the alleged offense of public indecency.

After preliminary motions were made and ruled on, the Board heard the evidence. In support of the charges, the City called the teacher, the girlfriend, the friend whom the school teacher called in the attempt to get the $100 bail bond money, the McCormick YWCA clerk who cashed the girlfriend's $50 check and four police officers who investigated the charges. On behalf of Oster, the Board heard four reputation and character witnesses. In addition, Oster testified and denied he was near the North Avenue beach parking lot the evening of May 9, 1969. He said that at the time it was claimed he was near the McCormick "Y," he was supervising the work of Patrolman George Romano who was investigating a burglary at 1441 North State Parkway. Romano testified that Oster, as the supervising sergeant, arrived at the scene of the burglary at about 20 minutes before 11 P.M. Then, taking the cause under advisement, the Board found that the charges had been sustained and entered an order which directed that "* * * Herbert Oster, be * * * separated from his position as a Sergeant in the Department of Police."

Within the statutory period, Oster invoked the Administrative Review Act and filed a complaint against the Board, its officers and members praying for an order directing it to file the record of the proceedings before it as answer to his complaint and for judicial review of those proceedings. He prayed for an order reversing and setting aside the findings and decision of the Board with the request that he be ordered reinstated as a police officer of the City of Chicago. Within the time required, the Board filed its answer which included the record of the proceedings against Oster. After hearing the parties, the trial court entered an order "* * * that the findings of the defendant Police Board are against the manifest weight of the evidence." It reversed the decision.

■■■ In determining whether the Board's findings were supported by manifest weight of the evidence; and whether, because they were, it was error for the trial court to reverse the decision, we bear in mind that the findings and conclusions of an administrative agency on questions of fact are *prima facie* true and correct. (See Ill. Rev. Stat. 1969, ch. 110, par. 274.) Of course, such findings have to be supported by evidence. (*Drezner v. Civil Service Commission*, 398 Ill. 219, 75 N.E.2d 303.) And while they can be reviewed to determine their support in the record, they

cannot be set aside unless they are against the manifest weight of the evidence. (*Zinser v. Board of Fire & Police Commissioners*, 28 Ill.App.2d 435, 172 N.E.2d 33.) Mere conflict, however, between the testimony of witnesses will not justify a trial court concluding that the findings of an administrative agency must be set aside. See *Schwarze v. Board of Fire & Police Commissioners*, 46 Ill.App.2d 64, 196 N.E.2d 724; *Avent v. Police Board*, 49 Ill.App.2d 228, 199 N.E.2d 637; *Ceja v. State Police Merit Board*, 12 Ill.App.3d 52, 298 N.E.2d 378.

In this case, the Board heard the testimony of the teacher and his girl-friend that on the evening of May 9, 1969, they had an adequate opportunity to observe the officer in question and that Oster was the Chicago police officer who took $50 from them through the subterfuge of saying that they were under arrest for public indecency. These two witnesses, in material part, were supported by the friend whom the teacher called and by the McCormick YWCA clerk who cashed the $50 check. The teacher and his girlfriend were positive and certain in their identification of Oster. Moreover, Oster himself, in an interesting way, corroborated them when he testified that at approximately 10:30 P.M. on the evening in question, while in his squad car, he received a radio call concerning a suspicious man in the 1100 block of North Dearborn Street. The girlfriend had testified that while she was in Oster's police car the same evening, a radio call about a strange man on North Dearborn Street diverted his attention. The girl's recollection of this radio call considered with Oster's admission that he received a similar one at approximately the same time, tended to support complainants' version of the events.

The Board also heard the watch commander who testified concerning the lineup from which the two complainants picked out Oster as the offending policeman. The commander described how, before picking out Oster, the girlfriend hesitated when she came to the police officer named Mackin. A sergeant told the Board about the hundreds of photographs he showed the two witnesses, including pictures of the unit to which Oster belonged, all in the effort to get an identification of the offending policeman. Putting all of it into perspective, the sergeant described how the teacher and the girlfriend made prior tentative identifications of at least three policemen, other than Oster.

In contrast with the couple's testimony concerning Oster's identity as the offending policeman, the Board heard Oster testify that at the time it was claimed he was receiving the $50 near the McCormick YWCA, he was in fact supervising a burglary investigation a short distance away. In support of this alibi, Oster had the testimony of a fellow officer who described his presence at the other place. In addition, Oster bolstered his defense with the testimony of four character and reputation witnesses.

■■ Thus, as to Oster's identity, the Board had conflicting evidence before it. But resolution of conflicts in the evidence, even concerning identity of a person, was a matter entirely within the Board's province. (Compare *Avent v. Police Board of City of Chicago,* 49 Ill.App.2d 228, 199 N.E.2d 637.) And in determining whether in this administrative proceeding the Board properly resolved the conflict, analogy can be made to cases from the criminal law where identity has to be proved beyond a reasonable doubt. In criminal cases, omissions or discrepancies in the description of a person do not necessarily affect the validity of an identification, although such deviations go to the weight to be given the testimony of a witness. (See *People v. Claypool,* 6 Ill.App.3d 620, 285 N.E.2d 200; *People v. Bennett,* 9 Ill.App.3d 1021, 293 N.E.2d 687; *People v. Del Genio,* 10 Ill.App.3d 437, 294 N.E.2d 78.) In such cases, the method and manner of an identification only affect the weight of the evidence. (*People v. Tunstall,* 17 Ill.2d 160, 161 N.E.2d 300; *People v. Sulton,* 130 Ill.App.2d 1098, 266 N.E.2d 351; *People v. Burke,* 131 Ill.App.2d 76, 266 N.E.2d 547. )With regard to an alibi, even in a rape prosecution, the trier of the facts is under no obligation to believe defense witnesses over positive identification of an accused. (*People v. Newson,* 133 Ill.App.2d 391, 273 N.E.2d 416.) Therefore, in these proceedings where proof was by a preponderance of the evidence rather than beyond a reasonable doubt, the Board was not required to accept the testimony of Oster and his witnesses concerning the alibi, even though they were not directly impeached. Compare *People v. Pierre,* 114 Ill.App.2d 283, 252 N.E.2d 706.

■■ For these reasons, we conclude that the findings of the Police Board by which it ordered Oster discharged from the Chicago Police Department were supported by the manifest weight of the evidence. This being so, it was error for the trial court to set aside the Board's decision. (*Adamek v. Civil Service Commission,* 17 Ill.App.2d 11, 149 N.E.2d 466; *Kohout v. Civil Service Commission,* 28 Ill.App.2d 388, 171 N.E.2d 683.) Accordingly, the judgment is reversed and the cause is remanded with directions that the trial court affirm the findings and decision of the Police Board of the City of Chicago.

Reversed and remanded with directions.

HAYES, P. J., and DOWNING, J., concur.