165 N.J. Super. 278 (1979)
398 A.2d 115
STATE OF NEW JERSEY, PLAINTIFF-APPELLANT,
v.
FREDERICK LUTZ, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued November 27, 1978.
Decided January 17, 1979.
*281 Before Judges SEIDMAN and BOTTER.
Mr. Rushton H. Ridgway, Assistant Prosecutor, argued the cause for appellant (Mr. William P. Doherty, Jr., Prosecutor of Cumberland County, attorney; Mr. Ridgway, of counsel and on the brief).
Mr. Edwin J. Jacobs argued the cause for respondent (Messrs. Tort, Daniels & Jacobs, attorneys).
The opinion of the court was delivered by SEIDMAN, J.A.D.
Defendant was indicted for the murder of one Luis Eric Afanador. On the day of the trial, a combined preliminary inquiry under Evid. R. 8(1) and (3) was conducted by the trial judge to determine the admissibility of statements allegedly made by defendant at the police station, and of in-court and out-of-court identifications of defendant by the State's chief witness, Irma Ocasio. The hearing took place after the jury was selected, but before it was sworn. At the conclusion of the voir dire the trial judge determined that the statements and the identifications should be excluded. He then postponed the trial without date to enable the State to seek appellate review of the rulings. We granted the State's motion for leave to appeal. For reasons that follow, we reverse and remand the matter for trial.
*282 With respect to the admissibility of statements alleged to have been made by defendant at the police station, the trial judge found a failure by the State to prove beyond a reasonable doubt that defendant was given fully the warnings required by Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and on that basis declared inadmissible any statements made by defendant following the incomplete warnings. The State concedes that the Miranda warnings were not properly administered and that anything said by defendant thereafter would not be admissible.
The controversy is over the trial judge's further exclusion of statements made by defendant between the time of his arrival at the police station in the company of a police officer and the faulty warnings, essentially because, as the trial judge viewed defendant's state of mind subjectively, "going into the police station puts him in custody." The trial judge said that since he could not tell when defendant considered himself "deprived of freedom of action in a significant way," that is, "was it five minutes after he got in the police station, 20 minutes after he got in the police station, was it two minutes or was it going up the police station steps * * * therefore custody began upon arrival at the station."
The proofs adduced at the preliminary inquiry show the following facts. On January 31, 1976, shortly after 11:30 P.M., the body of Afanador, an apparent homicide victim, was discovered in his automobile in the parking lot of a department store in Vineland. The death (the cause of which does not appear in the record) was estimated by the medical examiner to have occurred approximately 12 hours earlier. Later that night, in the course of their investigation, the police interviewed decedent's brother, who indicated to them that defendant would know more about decedent than he himself because they were close friends. He "thought there was a [homosexual] relationship between them." A police officer, accompanied by three others, all in plain clothes, drove to defendant's home in an unmarked car, arriving there between 3:30 and 4:00 A.M. At this time, according to the officer, *283 no one was under suspicion. Their purpose was to "get some more background information to give our investigation some form of direction."
Upon arriving the police sounded the horn of their automobile. Defendant came out of his house within a few minutes, partially clad in night clothes. The officers entered the house and informed defendant that Afanador had been in an accident, whereupon defendant inquired if Mrs. Afanador was all right. Defendant agreed to return to the police station "to help in the investigation." After dressing he drove to the police station in his truck, accompanied by one of the officers. The others returned in the police car. Defendant and the officer conversed during the trip, but he still was not suspected "in any manner as being concerned with the homicide of Mr. Afanador."
At the police station, because he "was not a suspect," defendant was taken for questioning, not to the interrogation room, but to the detectives' room  a large general office containing a number of desks where persons continually came in and went out. After interrogating defendant for about an hour and a half, the police learned of the estimated hour of the victim's death and it then became evident that defendant was placing himself in the company of decedent at a time after the homicide had apparently occurred. It was at this point that the police decided to advise defendant of his rights. We are satisfied that prior thereto the information that the police had concerning the alleged relationship between defendant and decedent and defendant's odd response when he was informed that his friend had been in an accident were not sufficient to inculpate him and make him a prime suspect.
The Miranda warnings are, of course, a prerequisite to custodial interrogation, by which is meant "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, supra at 444, 86 S.Ct. at 1612. In their absence, statements made by a defendant, whether exculpatory or inculpatory, may not *284 be used by the prosecution. Id. The frequently encountered variable is what constitutes "custodial interrogation."
The recent case of Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), involved a defendant who had been convicted of first-degree burglary at a trial in which his confession was critical to the state's case. The Oregon Supreme Court had reversed the conviction, holding that although defendant had not been arrested or formally detained, the interrogation took place in a coercive environment of the sort to which Miranda was intended to apply. The United States Supreme Court reversed. It held that where defendant, suspected by the police as the culprit, came voluntarily to the police station and was informed that he was not under arrest, and after a half-hour interview left the police station, and there was no indication that the questioning took place in a context where defendant's freedom to depart was restricted in any way, defendant was not "in custody `or otherwise deprived of his freedom of action in any significant way.'" 429 U.S. at 495, 97 S.Ct. at 714. The court emphasized that a non-custodial situation is not converted to one in which Miranda applies merely because the questioning takes place in a "coercive environment":
* * * Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer Miranda warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house or because the questioned person is one whom the police suspect. Miranda warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was that sort of coercive environment to which Miranda by its terms was made applicable and to which it was limited. [429 U.S. at 495, 97 S.Ct. at 714.]
Cf. United States v. Long Soldier, 562 F.2d 601, 603, fn. 1, (8 Cir.1977); Hancock v. Estelle, 558 F.2d 786 (5 Cir.1977); Starkey v. Wyrick, 555 F.2d 1352 (8 Cir.1977), *285 cert. den. 434 U.S. 848, 98 S.Ct. 156, 54 L.Ed.2d 116 (1977); Barfield v. Alabama, 552 F.2d 1114 (5 Cir.1977); and see Steigler v. Anderson, 496 F.2d 793, 799 (3 Cir.1974), cert. den. 419 U.S. 1002, 95 S.Ct. 320, 42 L.Ed. 2d 277 (1974); Iverson v. North Dakota, 480 F.2d 414, 423-424 (8 Cir.1973), cert. den. 414 U.S. 1044, 94 S.Ct. 549, 38 L.Ed.2d 335 (1973).
On the other hand, as we said in State v. Godfrey, 131 N.J. Super. 168, 175 (App. Div. 1974), aff'd 67 N.J. 267 (1975), custody in the Miranda sense does not necessitate a formal arrest, "nor does it require physical restraint in a police station, nor the application of handcuffs, and may occur in a suspect's home or a public place other than a police station." We recognize that no precise definition could be formulated which would apply in advance to all cases and prescribe the outer limits of the protection afforded, but that a case-by-case approach was required in which the totality of the circumstances must be examined. 131 N.J. Super. at 177, Steigler v. Anderson, supra at 798.
It should be stressed that the issue here is not whether, at some point during the interrogation at the police station but prior to the disclosure which produced the Miranda warnings, the totality of the circumstances was such that defendant might then have been deemed deprived of his freedom of action in a significant way. See Iverson v. North Dakota, supra. This is so because the trial judge professed a complete inability to make such determination. He chose, instead, to hold that defendant's mere entering the police station placed him in custody. We gather the rationale to have been defendant's assumed "subjective state of mind" at that time. But we cannot tell from the trial judge's remarks whether he meant that the then existing circumstances, fairly construed, would reasonably have led defendant to believe that once in the police station he would not be permitted to leave, or whether a reasonable man, innocent of any crime, would have thought so had he been in defendant's position, assuming that such tests, standing alone, *286 would suffice for a holding that custody then existed. See State v. Godfrey, supra at 176, fn. 1. In any event, we find in the record no support whatever for the conclusion reached.
The trial judge was satisfied, we think correctly, that defendant was not in custody during the drive from his home to the police station. The record is devoid of any indication that the police had reason in that interval to suspect defendant of any involvement in the homicide, and defendant was in fact not under suspicion at that time. We suppose that the trial judge was equally convinced that defendant did not have cause to believe that his freedom of action was being significantly restricted in any way. We therefore do not see how, without more, defendant's act of crossing the threshold of the police station would have converted a non-custodial situation into a custodial one within the contemplation of Miranda and Oregon v. Mathiason, supra. We conclude that the trial judge was in error in ruling as he did.
If defendant should contend on the remand that a state of custody arose at some time during the course of the interrogation short of the disclosure which prompted the Miranda warnings, he will have the opportunity to request a further preliminary hearing on the issue, which preferably should be held after the jury is selected and sworn to avoid any further fractionalizing of the trial and possibly another interlocutory appeal. See State v. Hawthorne, 49 N.J. 130, 143 (1967).
We turn now to the exclusion of Irma Ocasio's testimony relating to the identification of defendant. According to the proofs adduced on the voir dire, the police learned sometime in March 1976 that Miss Ocasio had information that would be helpful to the case. She disclosed to them that on the day in question, while it was still daylight, as she was leaving the department store's parking area, she observed a red sports car about to turn into the lot. She recognized it to be the one owned by Afanador, whom she knew. She stopped to let the other car pass and observed the man who was driving "[j]ust for a second" before proceeding. The *287 man was looking straight ahead, but turned and gazed in her direction. It was not Afanador. Miss Ocasio said that she continued to observe the driver as she moved forward, although her view was restricted to the portion of his body from the forehead to the shoulders. She described him as a white man, with a mustache, light hair and large eyes. He was not wearing glasses.
At the initial police interview, Miss Ocasio was shown eight photographs, including one of defendant. They all depicted Caucasians similar in physical appearance to defendant. Some wore glasses, others had mustaches, and some had both features. Although she could not definitely identify any of the photographs, she selected the one of defendant.[1] Her reason was that although the man in the photograph was wearing glasses, he had a mustache that "looked exactly like Fred Lutz." She told the police, "I not quite sure but it looked like this."
A week before the voir dire Miss Ocasio was again shown a group of photographs, this time by an assistant prosecutor. They were the same ones as before, except that they were enlarged and showed the subject only from the forehead down. She again picked out the picture of defendant. She testified that the photograph selected made her remember the person she saw in the car. While she was not sure if it was the same person, it "looked like him." She remembered the mustache distinctly and also part of the face. On cross-examination she stated both pictures looked like the man she saw in the car, because of "the type of the face, the mouth and the nose, that is only all I can see." When defendant was pointed out to Miss Ocasio in the courtroom, she could not say he was the man in the car, but "[h]e looked like him." On recross-examination, she was asked *288 whether, if she had never seen the photographs, she would "be able to come to Court today and say that this man resembled the man * * *." Her response was, "I would say that he reminds me of him." The hearing then recessed for two days.
When the hearing was resumed the trial judge stated that the testimony regarding the photographs was hearsay and would not be admitted. He said that no identification had in fact been made, since an identification should have been phrased, "That is the person I saw," and not, "[T]he person I saw maybe, perhaps, I can't be sure." The trial judge further ruled that the witness would not be permitted to make an in-court identification, not only for that reason but also because "her ability and opportunity to observe the person driving Afanador's car that afternoon was so fleeting and so restricted and so limited as to be unreliable."
The voir dire was reopened after the assistant prosecutor revealed that en route to the court house Miss Ocasio had told a detective that she could identify defendant if he would remove his glasses. Defendant was asked to do so, whereupon the witness said, "He looks like him, yes." At her request the trial judge then directed defendant to turn his head to the side. The witness responded, "Yes. That was him."
The trial judge again ruled out the identification testimony, basing his decision essentially on three grounds: his observation of the witness on the stand, her inability to observe the man driving the car, and her overall unreliability in testifying. He also considered the fact that defendant had been sitting at the counsel table for two days, that the witness was related to decedent, and that there was "some suttle [sic] unspoken implicit pressure for her to come through at this time * * * and make a good identification since the State's case hinges on it * * *."
In the course of the colloquy preceding his decision, the trial judge expressed the view that "the purpose of a Wade hearing is absolutely to determine the quality * * * to determine *289 the witness's prior ability to observe, see and believe it or not, it's a singular exception to it. An identification problem is the one time the trial court has to pass on the quality of the witness's testimony." We disagree with his concept.
A "Wade"[2] hearing, as it is called, is to determine the admissibility of an in-court identification of a defendant by a witness where it is contended that the out-of-court identification procedures by the police were so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). If those procedures "were so impermissibly suggestive as to fix in the victim's mind an identity probably based upon photographs rather than upon an independent mental picture of the person gained from observations of him at the time of commission of the crime, the in-court identification should be excluded." State v. Thompson, 59 N.J. 396, 418-419 (1971). The Simmons standard, with deletion of the word "`irreparable' * * * serves equally well for the admissibility of testimony concerning the out-of-court identification itself." Neil v. Biggers, 409 U.S. 188, 198, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972). See Evid. R. 63(1) (c).
What is being tested in the preliminary inquiry is whether the choice made by the witness represents his own independent recollection or whether it in fact resulted from suggestive words or conduct of a law enforcement officer. The strength or credibility of the identification is not the issue on admissibility; that is a matter of weight, for the fact finder, under appropriate instructions from the trial judge. [State v. Farrow, 61 N.J. 434, 451 (1972), cert. den. 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973)]
But here there was no proof whatsoever of any impermissibly suggestive procedure on the part of the law enforcement *290 authorities when the photographs were exhibited to the witness on the two occasions, and the trial judge referred to none. He excluded the out-of-court identification testimony upon a finding that no identification at all had in fact been made by the witness, because she did not say in so many words that defendant was the man she had seen driving into the parking lot, and he made a further anticipatory ruling that the witness would not be permitted to make an in-court identification because her observation of the person driving the decedent's car was so limited "as to be unreliable."
We are satisfied from our careful review of the record that Miss Ocasio's testimony was not so utterly lacking in probative value as to require the trial judge to reject it as a matter of law. See Evid. R. 4. It is true that the witness was uncertain at the photographic displays and could not make an unequivocal identification of defendant. But the lack of a "positive" identification did not invalidate her testimony in its entirety. An identification can be absolute or qualified, and, if it is limited, that circumstance, taken into account with the remaining evidence, will determine whether there is sufficient proof to constitute a fact question to be decided by a jury.[3]State v. Cerce, 22 N.J. 236, 244 (1956); State v. Travers, 70 N.J. Super. 32, 37-38 (App. Div. 1961); State v. Buffa, 51 N.J. Super. 218, 235 (App. Div. 1958), aff'd 31 N.J. 378 (1966), cert. den. 364 U.S. 916, 81 S.Ct. 279, 5 L.Ed.2d 228 (1969). The lack of certainty on the part of the identifying witness, or the indefiniteness of the identification, goes to the weight to be given the testimony and to its credibility. These are matters for the jury to resolve, not the judge. State v. Farrow, supra, 61 N.J. at 452. See United States v. Hudson, 564 F.2d *291 1377, 1379 (9 Cir.1977); Smith v. United States, 358 F.2d 695 (5 Cir.1966), cert. den. 384 U.S. 971, 86 S.Ct. 1862, 16 L.Ed.2d 682 (1966); State v. Church, 231 N.C. 39, 55 S.E.2d 792, 795 (Sup. Ct. 1949); Commonwealth v. Kloiber, 378 Pa. 412, 106 A.2d 820 (Sup. Ct. 1954), cert. den. 348 U.S. 875, 75 S.Ct. 112, 99 L.Ed. 688 (1954); Commonwealth v. Ronello, 251 Pa. 329, 96 A. 826, 828 (Sup. Ct. 1916).
Testimony that a defendant looks like or resembles the person observed by the witness, or is of the same size or general appearance, or has physical features fairly close to the accused is competent and may be sufficient when considered with the other evidence. Cf. United States v. Hudson, supra; United States v. Peterson, 435 F.2d 192, 196 (7 Cir.1970), cert. den. 403 U.S. 907, 91 S.Ct. 2212, 29 L.Ed.2d 683 (1971); Smith v. United States, supra; United States v. Kelley, 334 F. Supp. 435, 436 (S.D.N.Y. 1971), aff'd 471 F.2d 647 (2 Cir.1973); People v. Molarius, 213 Cal. App.2d 10, 28 Cal. Rptr. 541, 545 (D. Ct. App. 1963); People v. Cuellar, 110 Cal. App.2d 273, 242 P.2d 694, 696 (D. Ct. App. 1952); Smallwood v. State, 114 Ga. App. 459, 151 S.E.2d 789, 790 (Ct. App. 1966); People v. Burke, 131 Ill. App.2d 76, 266 N.E.2d 547 (Ct. App. 1970); State v. Farley, 358 A.2d 516 (Me. Sup. Jud. Ct. 1976); State v. Senske, 291 Minn. 228, 190 N.W.2d 658 (Sup. Ct. 1971); State v. Blackmore, 327 Mo. 708, 38 S.W.2d 32 (Sup. Ct. 1931); State v. Carcerano, 238 Or. 208, 390 P.2d 923, 927 (Sup. Ct. 1964).
It is our view that the trial judge erred in determining to reject the out-of-court identification testimony. His decision to exclude the in-court identification was also erroneous. The basis for the latter decision was the trial judge's conviction that the witness was unreliable, despite the fact that she finally did make a positive identification of defendant after he removed his glasses and turned his face sideways. We note at the outset that his evaluation of the *292 witness was predicated upon his observation of her on the stand and her "overall unreliability in testifying." However, this pertained not to the admissibility of the testimony, but to its weight and credibility, so that the trial judge, to that extent, invaded the province of the jury. That the witness may have been related to the decedent, or that defendant had been sitting at the counsel table for two days, was a matter that is normally reserved for consideration by a jury. And the remark concerning "unspoken implicit pressure for her to come through at this time," was an inference that may or may not have been drawn, and was, in any event, no more than a comment on credibility.
Further, as to the reliability of the in-court identification,[4] the trial judge's appraisal of the witness' opportunity to observe the man driving the car as "so fleeting and so restricted and so limited as to be unreliable," was a matter for the jury to consider. In State v. Farrow, supra, for example, the court observed that what defendant was really complaining about was not suggestive procedures in connection with the photographic display to the witnesses, but "that the hour of the day and lighting conditions, the excitement of the occasion, and the fleeting glimpse that these young boys had of the culprits made their later identifications of defendant unreliable and untrustworthy." The court, noting that the witnesses were "rigorously cross-examined, both on the voir dire and before the jury, by assiduous defense counsel and all weaknesses in their identifications fully pointed up," rejected the contention on the ground that "the worth [of the identifications] * * * was for the fact finder, not the court." 61 N.J. at 451-452. See also, on this issue, State v. Smith, 165 Conn. 680, 345 A.2d 41, 43 (Sup. Ct. 1974); Medsker v. State, 224 Ind. 587, *293 70 N.E.2d 182, 183 (Sup. Ct. 1946); People v. Moore, 29 Mich. App. 597, 185 N.W.2d 834, 837 (Ct. App. 1971); People v. McCoy, 71 Misc.2d 381, 337 N.Y.S.2d 49, 50 (Sup. Ct. 1972); State v. Cantrell, 81 Wash.2d 213, 500 P.2d 777, 778 (Sup. Ct. 1972). It is to be noted in this regard that the due process issue of impermissibly suggestive procedures does not pertain to whether the identification was in fact reliable. As the court stressed in Russell v. United States, 133 U.S. App. D.C. 77, 408 F.2d 1280 (D.C. Cir.1969), cert. den. 395 U.S. 928, 89 S.Ct. 1786, 23 L.Ed.2d 245 (1969),
* * * Stovall v. Denno [388 U.S. 293, [87 S.Ct. 1967, 18 L.Ed.2d 1199] (1967)] did not erect a due process barrier against all unreliable identifications; it requires exclusion only of evidence which could and should have been obtained by procedures less conducive to unreliability. Thus, as a general rule, if the confrontation was not improper, the reliability of the resulting identification is for the jury to decide. [at 1285]
To sum up, the in-court and out-of-court identification testimony of Miss Ocasio should not have been ordered excluded at the conclusion of the voir dire. Its sufficiency for a conviction, if the testimony should be accepted as credible by a jury, is another matter. Such determination must await the trial itself, at which the sufficiency of all the proofs at the close of the State's case can be tested in the usual way by the standard laid down in State v. Reyes, 50 N.J. 454, 458-459 (1967).
Reversed and remanded for trial.
NOTES
[1] The witness described defendant as middle-aged. The police had estimated his age to be about 50. It was not until nearly the end of the interrogation at the police station that defendant revealed he was 72 years of age.
[2] United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).
[3] It has been said that the positiveness of an identification is to be weighed warily and in the realization that the most assertive witness is not invariably the most reliable one. Clemons v. United States, 133 U.S. App. D.C. 27, 39, 408 F. 2d 1230, 1242 (D.C. Cir.1968).
[4] Evid. R. 63(1) (c) pertains to pretrial identifications only, and not to in-court identifications. See State v. Matlack, 49 N.J. 491, 499-500 (1967).